SHARON ESTHER BERMAN, AN INFANT BY HER GUARD-
IAN *AD LITEM* PAUL A. BERMAN; PAUL A. BERMAN,
INDIVIDUALLY AND SHIRLEY A. BERMAN, PLAIN-
TIFFS-APPELLANTS, v. RONALD ALLAN AND MICHAEL
V. ATTARDI, DEFENDANTS-RESPONDENTS.

Argued February 20, 1979—Decided June 26, 1979.

422

*Mr. William O. Barnes, Jr.* argued the cause for appellants.

*Mr. Richard E. Brennan* argued the cause for respondents (*Messrs. Shanley* and *Fisher,* attorneys; *Mr. John D. Clemen,* on the brief).

The opinion of the court was delivered by

PASHMAN, J. In *Gleitman v. Cosgrove,* 49 *N. J.* 22 (1967), decided 12 years ago, this Court refused to recognize as valid causes of action either a claim for "wrongful life" asserted on behalf of a physically deformed infant or a claim for "wrongful birth" put forth by the infant's parents. Both prayers for relief were premised upon the allegation that had the physician treating Mrs. Gleitman during her pregnancy followed standard medical practice, an abortion would have been procured and the child would never have come into existence. In this case, we are called upon to assess the continued validity of both of our holdings in *Gleitman.*

On September 11, 1975, Paul and Shirley Berman, suing both in their own names and as Guardians *ad litem* for their infant daughter Sharon, instituted the present malpractice action against Ronald Allan and Michael Attardi, medical doctors licensed by the State of New Jersey. Two causes of action were alleged. The first, a claim for damages based upon "wrongful life," was asserted by Mr. Berman on behalf of the infant Sharon. The second, a claim denominated "wrongful birth," sought compensation for injuries suffered by the parents in their own right.

The factual allegations underlying each of these prayers for relief can be briefly summarized. From February 19 until November 3, 1974, Mrs. Berman, while pregnant with

Sharon, was under the care and supervision of Drs. Allan and Attardi, both of whom are specialists in gynecology and obstetrics. At the time of her pregnancy, Mrs. Berman was 38 years of age. On November 3, Sharon was born afflicted with Down's Syndrome — a genetic defect commonly referred to as mongolism.

Plaintiffs allege that defendants deviated from accepted medical standards by failing to inform Mrs. Berman during her pregnancy of the existence of a procedure known as amniocentesis. This procedure involves the insertion of a long needle into a mother's uterus and the removal therefrom of a sample of amniotic fluid containing living fetal cells. Through "karyotype analysis" — a procedure in which the number and structure of the cells' chromosomes are examined — the sex of the fetus as well as the presence of gross chromosomal defects can be detected. See W. Fuhrmann & F. Vogel, *Genetic Counseling* 91–94 (2d Ed. 1976); A. Emery, *Elements of Medical Genetics* 54–59 (3d Ed. 1974); Note, "Father and Mother Know Best: Defining the Liability of Physicians for Inadequate Genetic Counseling," 87 *Yale L. J.* 1488, 1493 & n. 21 (1978). Prenatal diagnosis of genetic adnormalities is potentially available for approximately 60 to 90 metabolic defects, including Tay-Sachs Disease and Down's Syndrome. See Milunsky, "Prenatal Diagnosis of Genetic Disorders," 295 *New Eng. J. Med.* 377 (1976); Golbus, "The Antenatal Detection of Genetic Disorders," 48 *Obstetrics & Gynecology* 497 (1976). Recent studies indicate that amniocentesis is highly accurate in predicting the presence of chromosomal defects, and that the risk of even minor damage to mother or fetus deriving from the procedure is less than one percent. See NICHD National Registry ffor Amniocentesis Study Group, "Midtrimester Amniocentesis for Prenatal Diagnosis," 236 *J. Am. Med. A.* 1471 (1976) (99.4% accuracy in 1,040 cases); Simpson, Dallaire, Miller, Siminovich, Hamerton, Miller & McKeen, "Prenatal Diagnosis of Genetic Disease in Canada," 115 *Canadian Med. A. J.* 739 (1976) (99.4% accuracy in 1,223 cases).

Due to Mrs. Berman's age at the time of her conception, plaintiffs contend that the risk that her child, if born, would be afflicted with Down's Syndrome was sufficiently great that sound medical practice at the time of pregnancy required defendants to inform her both of this risk and the availability of amniocentesis as a method of determining whether in her particular case that risk would come to fruition. Had defendants so informed Mrs. Berman, the complaint continues, she would have submitted to the amniocentesis procedure, discovered that the child, if born, would suffer from Down's Syndrome, and had the fetus aborted.

As a result of defendants' alleged negligence, the infant Sharon, through her Guardian *ad litem,* seeks compensation for the physical and emotional pain and suffering which she will endure throughout life because of her mongoloid condition. Mr. and Mrs. Berman, the child's parents, request damages in their own right both for the emotional anguish which they have experienced and will continue to experience on account of Sharon's birth defect, and the medical and other costs which they will incur in order to properly raise, educate and supervise the child.

On November 4, 1977, the trial judge granted summary judgment in favor of defendants on the ground that plaintiffs had failed to state any actionable claim for relief. In his view, *Gleitman v. Cosgrove, supra,* was dispositive of the issues presented. On December 22, 1977, plaintiffs filed a notice of appeal to the Appellate Division. While the matter was pending before the appellate judges, we directly certified the case to this Court on our own motion. *See R.* 2:12–1.

I

Before addressing the merits of the various contentions put forth by the parties, it is important to emphasize the procedural posture in which the present controversy reaches us. Plaintiffs' complaint was dismissed before trial for failure to

state a valid cause of action. As such, we must accept as true each and every element of that complaint and construe all reasonable inferences flowing from plaintiffs' allegations in a light most favorable to their cause. *See, e. g., Heavner v. Uniroyal, Inc.,* 63 *N. J.* 130, 133–134 (1973); *Melone v. Jersey Central Power & Light Co.,* 18 *N. J.* 163, 170 (1955).

Specifically, we must assume that at the time of pregnancy: (1) defendants failed to inform Mrs. Berman of the availability of amniocentesis; (2) this failure to inform constituted a departure from acceptable medical practice; (3) had she been informed, Mrs. Berman would have submitted to amniocentesis; (4) the results of the procedure would have indicated that the child, if born, would be afflicted with Down's Syndrome; and (5) upon being notified of this fact, she would have had the fetus aborted. Our sole inquiry is whether any or all plaintiffs would be entitled to damages should they substantiate each of the above allegations at trial.

## II

The claim for damages asserted on behalf of the infant Sharon has aptly been labeled a cause of action grounded upon "wrongful life." Sharon does not contend that absent defendants' negligence she would have come into the world in a normal and healthy state. There is no suggestion in either the pleadings below or the medical literature which we have scrutinized that any therapy could have been prescribed which would have decreased the risk that, upon birth, Sharon would suffer from Down's Syndrome. Rather, the gist of the infant's complaint is that had defendants informed her mother of the availability of amniocentesis, Sharon would never have come into existence.

As such, this case presents issues different from those involved in malpractice actions where a plaintiff asserts that a defendant's deviation from sound medical practices *increased* the probability that an infant would be born with defects. *See, e. g., Sylvia v. Gobeille,* 101 *R. I.* 76, 220 *A.* 2d 222

(Sup. Ct. 1966). Nor are we here confronted with a situation in which an individual's negligence while a child was in gestation caused what otherwise would have been a normal and healthy child to come into the world in an impaired condition. *See, e. g., Smith v. Brennan,* 31 *N. J.* 353 (1960); W. Prosser, *Law of Torts* § 55 at 335–338 (4th Ed. 1971). Here, defendants' alleged negligence neither caused the mongoloid condition nor increased the risk that such a condition would occur. In the words of the *Gleitman* majority, "the infant plaintiff [asserts] . . . not that [she] should have been born without defects but [rather] that [she] should not have been born at all. . ." 49 *N. J.* at 28. In essence, Sharon claims that her very life is "wrongful."

The *Gleitman* majority refused to recognize as valid a cause of action predicated upon wrongful life. Its main reason for so holding was that damages would be impossible to ascertain. *See* 49 *N. J.* at 28–29; *id.* at 63 (Weintraub, C. J., concurring and dissenting).

The primary purpose of tort law is that of compensating plaintiffs for the injuries they have suffered wrongfully at the hands of others. As such, damages are ordinarily computed by "comparing the condition plaintiff would have been in, had the defendants not been negligent, with plaintiff's impaired condition as a result of the negligence." *Id.* at 28; *see generally,* W. Prosser, *supra,* § 55 at 335–338; Note, "Wrongful Life and A Fundamental Right to be Born Healthy," 27 *Buffalo L. Rev.* 537, 555–559 (1978). In the case of a claim predicated upon wrongful life, such a computation would require the trier of fact to measure the difference in value between life in an impaired condition and the "utter void of nonexistence." *Gleitman, supra,* 49 *N. J.* at 28. Such an endeavor, however, is literally impossible. As Chief Justice Weintraub noted, man, "who knows nothing of death or nothingness," simply cannot affix a price tag to nonlife. *Id.* at 63 (Weintraub, C. J., concurring & dissenting). *See, e. g., Gildiner v. Thomas Jefferson Univ. Hospital,* 451 *F. Supp.* 692, 694 (E. D. Pa. 1978); *Elliot v. Brown,* 361

So. 2d 546, 547–549 (Ala. Sup. Ct. 1978); *Stills v. Gratton,*
55 *Cal. App.* 3d 698, 127 *Cal. Rptr.* 652, 656–657 (Dist. Ct.
App. 1976); *Becker v. Schwartz,* 46 *N. Y.* 2d 401, 413 *N. Y.
S.* 2d 895, 386 *N. E.* 2d 807 (Ct. App. 1978); *Dumer v. St.
Michael's Hospital,* 69 *Wis.* 2d 766, 233 *N. W.* 2d 372, 375–
376 (Sup. Ct. 1975); Note, "Toward Rational Boundaries of
Tort Liability for Injury to the Unborn: Prenatal Injuries,
Preconception Injuries and Wrongful Life," 1978 *Duke Law
Journal,* 1401, 1445. *See generally,* Note, *supra,* 27 *Buffalo
L. Rev.* at 555–559.

Nevertheless, although relevant to our determination, we
would be extremely reluctant today to deny the validity of
Sharon's complaint solely because damages are difficult to
ascertain. The courts of this and other jurisdictions have
long held that where a wrong itself is of such a nature as
to preclude the computation of damages with precise exacti-
tude, it would be a "perversion of fundamental principles
of justice to deny all relief to the injured [party], and
thereby relieve the wrongdoer from making any amend for
his acts." *Story Parchment Co. v. Paterson Parchment Paper
Co.,* 282 *U. S.* 555, 563, 51 *S. Ct.* 248, 250, 75 *L. Ed.* 544,
548 (1931); *see, e. g., Martin v. Bengue, Inc.,* 25 *N. J.* 359,
373 (1957); *Jenkins v. Pennsylvania R. R. Co.,* 67 *N. J. L.*
331, 334 (E & A 1902). To be sure, damages may not be
determined by mere speculation or guess and, as defendants
emphasize, placing a value upon non-life is not simply dif-
ficult — it is humanly impossible. Nonetheless, were the
*measure* of damages our sole concern, it is possible that some
judicial remedy could be fashioned which would redress plain-
tiff, if only in part, for injuries suffered. *See, e. g.,* Kashi,
"The Case of the Unwanted Blessing: Wrongful Life," 31
*U. Miami L. Rev.* 1409 (1977); Note, "A Cause of Action
for 'Wrongful Life,'" 55 *Minn. L. Rev.* 58 (1970).

Difficulty in the *measure* of damages is not, however,
our sole or even primary concern. Although we conclude, as
did the *Gleitman* majority, that Sharon has failed to state
an actionable claim for relief, we base our result upon a

different premise — that Sharon has not suffered any damage cognizable at law by being brought into existence. *See, e. g., Becker v. Schwartz, supra,* 46 *N. Y.* 2d at 411, 413 *N. Y. S.* 2d at 900, 386 *N. E.* 2d at 812; *Note, supra,* 87 *Yale L. J.* at 1500–1502.

One of the most deeply held beliefs of our society is that life — whether experienced with or without a major physical handicap — is more precious than non-life. *See In re Quinlan,* 70 *N. J.* 10, 19 & n. 1 (1976). Concrete manifestations of this belief are not difficult to discover. The documents which set forth the principles upon which our society is founded are replete with references to the sanctity of life. The federal constitution characterizes life as one of three fundamental rights of which no man can be deprived without due process of law. *U. S. Const.,* Amends. V and XIV. Our own state constitution proclaims that the "enjoying and defending [of] life" is a natural right. *N. J. Const.* (1947), Art. I, § 1. The Declaration of Independence states that the primacy of man's "unalienable" right to life is a "self-evident truth." Nowhere in these documents is there to be found an indication that the lives of persons suffering from physical handicaps are to be less cherished than those of non-handicapped human beings.

State legislatures — and thus the people as a whole — have universally reserved the most severe criminal penalties for individuals who have unjustifiably deprived others of life. Indeed, so valued is this commodity that even one who has committed first degree murder cannot be sentenced to death unless he is accorded special procedural protections in addition to those given all criminal defendants. *See, e. g., Furman v. Georgia,* 408 *U. S.* 238, 92 *S. Ct.* 2726, 33 *L. Ed.* 2d 346 (1972). Moreover, it appears that execution is constitutionally impermissible unless the crime which a defendant has perpetrated was one which involved the taking of another's life. *See Coker v. Georgia,* 433 *U. S.* 584, 592, 97 *S. Ct.* 2861, 2866, 53 *L. Ed.* 2d 982, 989 (1977). Again, these procedural protections and penalties do not vary according to the presence or absence of physical deformities in the victim

or defendant. It is life itself that is jealously safeguarded, not life in a perfect state.

Finally, we would be remiss if we did not take judicial notice of the high esteem which our society accords to those involved in the medical profession. The reason for this is clear. Physicians are the preservers of life.

No man is perfect. Each of us suffers from some ailments or defects, whether major or minor, which make impossible participation in all the activities the world has to offer. But our lives are not thereby rendered less precious than those of others whose defects are less pervasive or less severe.

We recognize that as a mongoloid child, Sharon's abilities will be more circumscribed than those of normal, healthy children and that she, unlike them, will experience a great deal of physical and emotional pain and anguish. We sympathize with her plight. We cannot, however, say that she would have been better off had she never been brought into the world. Notwithstanding her affliction with Down's Syndrome, Sharon, by virtue of her birth, will be able to love and be loved and to experience happiness and pleasure — emotions which are truly the essence of life and which are far more valuable than the suffering she may endure. To rule otherwise would require us to disavow the basic assumption upon which our society is based. This we cannot do.

Accordingly, we hold that Sharon has failed to state a valid cause of action founded upon "wrongful life."

### III

The validity of the parents' claim for relief calls into play considerations different from those involved in the infant's complaint. As in the case of the infant, Mr. and Mrs. Berman do not assert that defendants increased the risk that Sharon, if born, would be afflicted with Down's Syndrome. Rather, at bottom, they allege that they were tortiously injured because Mrs. Berman was deprived of the option of making a meaningful decision as to whether to abort the

fetus, *see Gleitman, supra,* 49 *N. J.* at 63–65 (Weintraub, C. J., concurring & dissenting) — a decision which, at least during the first trimester of pregnancy, is not subject to state interference, *see Roe v. Wade,* 410 *U. S.* 113, 93 *S. Ct.* 705, 35 *L. Ed.* 2d 147 (1973). They thus claim that Sharon's "birth" — as opposed to her "life" — was wrongful.

Two items of damage are requested in order to redress this allegedly tortious injury: (1) the medical and other costs that will be incurred in order to properly raise, supervise and educate the child; and (2) compensation for the emotional anguish that has been and will continue to be experienced on account of Sharon's condition.

The *Gleitman* majority refused to recognize as valid a cause of action grounded upon wrongful birth. Two reasons underlay its determination. The first related to measure of damages should such a claim be allowed. In its view,

> In order to determine [the parents'] compensatory damages a court would have to evaluate the denial to them of the intangible, unmeasurable, and complex human benefits of motherhood and fatherhood and weigh these against the alleged emotional and money injuries. Such a proposed weighing is . . . impossible to perform . . . .
> [49 *N. J.* at 29]

Second, even though the Court's opinion was premised upon the assumption that Mrs. Gleitman could have legally secured an abortion, the majority concluded that "substantial [public] policy reasons" precluded the judicial allowance of tort damages "for the denial of the opportunity to take an embryonic life." 49 *N. J.* at 30.

■ In light of changes in the law which have occurred in the 12 years since *Gleitman* was decided, the second ground relied upon by the *Gleitman* majority can no longer stand in the way of judicial recognition of a cause of action founded upon wrongful birth. The Supreme Court's ruling in *Roe v. Wade, supra,* clearly establishes that a woman possesses a constitutional right to decide whether her fetus should be aborted, at least during the first trimester of

pregnancy. Public policy now supports, rather than militates against, the proposition that she not be impermissibly denied a meaningful opportunity to make that decision.

As in all other cases of tortious injury, a physician whose negligence has deprived a mother of this opportunity should be required to make amends for the damage which he has proximately caused. Any other ruling would in effect immunize from liability those in the medical field providing inadequate guidance to persons who would choose to exercise their constitutional right to abort fetuses which, if born, would suffer from genetic defects. *See* Note, *supra,* 87 *Yale L. J.* at 1504–1508; *see, e. g., Gildiner, supra,* 451 *F. Supp.* at 696; *Dumer, supra,* 233 *N. W.* 2d at 376–377; *Jacobs v. Theimer,* 519 *S. W.* 2d 846, 849 (Sup. Ct. Tex. 1975). *See generally,* Note, "Wrongful Conception: Who Pays For Bringing Up the Baby?," 47 *Fordham L. Rev.* 418, 419–422 (1978). Accordingly, we hold that a cause of action founded upon wrongful birth is a legally cognizable claim.

 Troublesome, however, is the measure of damages. As noted earlier, the first item sought to be recompensed is the medical and other expenses that will be incurred in order to properly raise, educate and supervise the child. Although these costs were "caused" by defendants' negligence in the sense that but for the failure to inform, the child would not have come into existence, we conclude that this item of damage should not be recoverable. In essence, Mr. and Mrs. Berman desire to retain all the benefits inhering in the birth of the child — *i. e.,* the love and joy they will experience as parents — while saddling defendants with the enormous expenses attendant upon her rearing. Under the facts and circumstances here alleged, we find that such an award would be wholly disproportionate to the culpability involved, and that allowance of such a recovery would both constitute a windfall to the parents and place too unreasonable a financial burden upon physicians. *See, e. g., Rieck v. Medical Protective Co.,* 64 *Wis.* 2d 514, 219 *N. W.* 2d 242, 244–245 (Sup.

Ct. 1974); *Coleman v. Garrison*, 349 *A.* 2d 8 (Sup. Ct. Del. 1975).

The parents' claim for emotional damages stands upon a different footing. In failing to inform Mrs. Berman of the availability of amniocentesis, defendants directly deprived her — and, derivatively, her husband — of the option to accept or reject a parental relationship with the child and thus caused them to experience mental and emotional anguish upon their realization that they had given birth to a child afflicted with Down's Syndrome. *See generally*, Note, *supra*, 1978 *Duke Law Journal* at 1453. We feel that the monetary equivalent of this distress is an appropriate measure of the harm suffered by the parents deriving from Mrs. Berman's loss of her right to abort the fetus. *See Gleitman, supra*, 49 *N. J.* at 64–65 (Weintraub, C. J., concurring & dissenting).

Unlike the *Gleitman* majority, we do not feel that placing a monetary value upon the emotional suffering that Mr. and Mrs. Berman have and will continue to experience is an impossible task for the trier of fact. In the 12 years that have elapsed since *Gleitman* was decided, courts have come to recognize that mental and emotional distress is just as "real" as physical pain, and that its valuation is no more difficult. Consequently, damages for such distress have been ruled allowable in an increasing number of contexts. *See, e.g., Zahorian v. Russell Fitt Real Estate Agency*, 62 *N. J.* 399 (1973); *Falzone v. Busch*, 45 *N. J.* 559 (1965); *Muniz v. United Hospitals Medical Center Presbyterian Hospital*, 153 *N. J. Super.* 79 (App. Div. 1977); *Lemaldi v. DeTomaso of America, Inc.*, 156 *N. J. Super.* 441 (Law Div. 1978); W. Prosser, *Law of Torts* § 54 at 327–335 (4th Ed. 1971). Moreover, as discussed in Part II *ante*, to deny Mr. and Mrs. Berman redress for their injuries merely because damages cannot be measured with precise exactitude would constitute a perversion of fundamental principles of justice. See *supra* at 428.

Consequently, we hold that Mr. and Mrs. Berman have stated actionable claims for relief. Should their allegations be proven at trial, they are entitled to be recompensed for the mental and emotional anguish they have suffered and will continue to suffer on account of Sharon's condition.

Accordingly, the judgment of the trial court is affirmed in part and reversed in part, and this case remanded for a plenary trial.

HANDLER, J., concurring in part and dissenting in part. We are called upon in this medical malpractice lawsuit to revisit the sensitive and perplexing problems engendered by the birth of a congenitally defective child and the suffering of its parents, aggrieved by the medical doctors who negligently failed to forewarn them of their misfortune. The Court wrestled with these questions some years ago in *Gleitman v. Cosgrove*, 49 *N. J.* 22 (1967) and a majority ruled that neither the parents nor the handicapped child had a sustainable cause of action for injuries, there being no claim that the malpractice in any way caused the birth defects of the child. Today we overrule that decision, at least in part.

The Court now recognizes that the parents of the impaired child have a cause of action for the doctors' breach of duty to render competent medical advice and services and that they are entitled to compensation for their mental and emotional suffering over the birth of their damaged child. I agree with this. However, I hold to a somewhat broader view of mental and emotional injury in these circumstances and would also include as an element of these damages impaired parenthood or parental capacity.

The Court does not, in its opinion, recognize as sustainable a cause of action on behalf of the child. On this, I differ. The child, in my view, was owed directly during its gestation, a duty of reasonable care from the same physicians who undertook to care for its mother — then expectant — and that duty, to render complete and competent medical advice, was seriously breached. The child, concededly, did not

become defective because of the physicians' dereliction; nevertheless, it suffered a form of injury or loss in having been born of parents whose parental capacity may have been substantially diminished by the negligence of their doctors. This is a loss to the child which should be recompensed. For these reasons I concur in part and dissent in part from the opinion of the Court.

I

It is important to have a clear picture of the claims which are asserted on behalf of the respective plaintiffs. Since the matter comes before the Court on the dismissal of plaintiffs' complaint for failure to state a cause of action, R. 4:6–2(e), the allegations of the complaint are to be accepted as true. These assertions, as pointed out by the Court, are that the defendant doctors were guilty of medical malpractice in failing to advise Mrs. Berman of the availability of amniocentesis, a procedure which would have revealed the defective condition of the unborn child and the certainty of its birth with Down's Syndrome; Mrs. Berman would have had the amniocentesis test administered and, upon learning that she was bearing a mongoloid child, she would have had an abortion to terminate her pregnancy; hence, the birth of her impaired child came about as a result of her physicians' medical negligence. *Ante* at 425–426. While these allegations are to be considered as true, I would not treat them as self-limiting. It is important to remember that the record in this case became fixed on the close of the pleadings, a very early, and perhaps, premature stage of the litigation. If the case were to take a normal course, including discovery, as well it might upon remand, plaintiffs would have the opportunity to clarify or amplify their claim. R. 4:9–1 to –4. The proofs, whether on plaintiffs' or defendants' case, might show that Mrs. Berman, instead of obtaining an abortion, would have elected to give birth to her child. In either event a tortious wrong has occurred and this should not affect the plaintiffs' claim for com-

pensation. Moreover, with respect to such claims, particularly in light of our opinions, *e. g. ante* at 430–431, plaintiffs should be able to seek to establish that mental and emotional suffering involves moral strife and includes the element of impaired parenthood and, further, that the child has a legitimate injury claim in the nature of a diminished childhood. I would approach the issues in the case from this wider perspective.

## II

The Court recognizes a valid cause of action on behalf of the parents for the "wrongful birth" of their child. It does so by repudiating the sufficiency of the reasons which earlier persuaded this Court in *Gleitman* to disallow such a claim. *Ante* at 431–432. Certainly the premise of our first decision, that a woman bearing a child with a birth defect could not in the earliest stages of pregnancy legally secure an abortion, is no longer tenable. The legal barriers to early abortion have been dropped. *Roe v. Wade,* 410 *U. S.* 113, 93 *S. Ct.* 705, 35 *L. Ed.* 2d 147, reh. den. 410 *U. S.* 959, 93 *S. Ct.* 1409, 35 *L. Ed.* 2d 694 (1973). These matters are no longer simply the prerogative of government. Individual rights of personal autonomy in this area are now accorded full weight. Public policy and social conscience no longer dictate judicial blindness and inaction with respect to the plight of a woman who has wrongfully been denied the opportunity to determine her destiny in whether or not to give birth to a gravely handicapped infant. Tribe, "Forward: Toward a Model of Roles in the Due Process of Life and Law", 87 *Harv. L. Rev.* 1 (1973); *G. Gunther, Cases and Materials on Constitutional Law* (9th ed. 1975) ch. 9, § 3, pp. 651–652; Sneideman, "Abortion: A Public Health And Social Policy Perspective", 7 *N. Y. U. Rev. L. & Soc. Change* 187, 201–202 (1978).

Other sound reasons are also advanced in support of a sustainable cause of action, which touch upon the corrective purposes of the law of torts. Doctors would not be discouraged

from malpractice if the claims of their wronged patients were disallowed. Also, to bar a claim for this kind of serious medical negligence would be tantamount to conferring immunity upon doctors from liability for their wrongful conduct. *Ante* at 432.

We have further determined that recovery for the wrong should not be stifled because the measure of damages may be troublesome. *Ante* at 432. The Court properly holds that damages should include "the monetary equivalent" of the emotional distress the parents experienced in giving birth to the defective child, "deriving from Mrs. Berman's loss of her right to abort the fetus. See *Gleitman, supra,* 49 *N. J.* at 64–65 (Weintraub, C. J., concurring and dissenting)." *Ante* at 433. It is to be recognized, however, that the measurement of damages for nonphysical injury is at best elusive and complex. Particularly in this kind of case, where these injuries stand alone and flow from the special relationship between an afflicted child and its parents, should care be taken in identifying compensable losses.

Approaches are suggested by a generous body of precedent. Our courts have long approved the award of damages for mental or emotional suffering resulting from tortious conduct. See *e. g., Morris v. MacNab,* 25 *N. J.* 271 (1957); *Allen v. Camden and Philadelphia Ferry Co.,* 46 *N. J. L.* 198 (E. & A. 1884); *Muniz v. United Hsps. Med. Ctr. Pres. Hsp.,* 153 *N. J. Super.* 79 (App. Div. 1977); *Kuzma v. Millinery Workers, etc., Local 24,* 27 *N. J. Super.* 579 (App. Div. 1953); *Spiegel v. Evergreen Cemetery Co.,* 117 *N. J. L.* 90 (Sup. Ct. 1936); *Harris v. D. L. & W.R.R. Co.,* 77 *N. J. L.* 278 (Sup. Ct. 1909), aff'd on appeal from remand, 82 *N. J. L.* 456 (E. & A. 1912). *Cf. Falzone v. Busch,* 45 *N. J.* 559 (1965). Such damages have also been essayed, at least on the trial level, in breach of contract warranty actions. See, *Lemaldi v. DeTomasso of America, Inc.,* 156 *N. J. Super.* 441 (Law Div. 1978); *cf. Fiore v. Sears, Roebuck & Co.,* 144 *N. J. Super.* 74 (Law Div. 1976) Humiliation damages for the indignities inflicted by acts of invidious discrimina-

tion have been approved in the civil rights area. *Zahorian v. Russell Fitt Real Estate Agency,* 62 *N. J.* 399 (1973); *Harvard v. Bushberg Bros.,* 137 *N. J. Super.* 537 (App. Div. 1975), certif. granted 71 *N. J.* 493 (1976) (dismissed by stipulation); *Gray v. Serruto Builders, Inc.,* 110 *N. J. Super.* 297 (Ch. Div. 1970); *cf. Castellano v. Linden Board of Education,* 79 *N. J.* 407, 416 (1978) (Handler, J., concurring in part and dissenting in part). Also see *W. Prosser, Law of Torts* § 12, pp. 49–62 (4th ed. 1971); 1 *J. Dooley, Modern Tort Law* §§ 15.01–15.13 (1977). Damages have also been allowed for the psychic injury to a mother resulting from an actual or anticipated tragic birth produced by negligent conduct. See *e. g., Graf v. Taggert,* 43 *N. J.* 303 (1964) (plaintiff could not recover for death of unborn child *en ventre sa mere* but could recover for emotional upset accompanying stillbirth); *Carter v. Public Service Coord. Transport,* 47 *N. J. Super.* 379 (App. Div. 1957) (pregnant plaintiff entitled to damages for anxiety over possible loss of unborn child). A trial court has recognized the reality of pain and suffering of a mother over the welfare of a child and that this anguish can endure for a period of time after the birth of the child. *E.g., Friel v. Vineland Obst. and Gynecological Professional Assoc.,* 166 *N. J. Super.* 579 (Law Div. 1979) (damages may be awarded for anxiety and shock as well as the uncertainty as to child's normality during formative years as a result of negligently caused premature birth).

Without doubt, expectant parents, kept in ignorance of severe and permanent defects affecting their unborn child, suffer greatly when the awful truth dawns upon them with the birth of the child. Human experience has told each of us, personally or vicariously, something of this anguish. Parents of such a child experience a welter of negative feelings — bewilderment, guilt, remorse and anguish — as well as anger, depression and despair. Griffin, Kavanagh & Sorenson, "Genetic Knowledge, Client Perspectives, and Genetic Counselling", 2 *Soc. Work in Health Care* 171, 174–175 (1976–

77) ; also Faleck & Britton, "Phases in Coping: The Hypothesis and Its Implications", 21 *Soc. Biology* 1 ,(1974). When such a tragedy comes without warning these terrible emotions are bound to be felt even more deeply. "Novelty shock" may well exacerbate the suffering. Wolfensberger & Menolascino, "A Theoretical Framework for the Management of Parents of the Mentally Retarded", *Psychiatric Approaches to Mental Retardation* 475 (Menolascino ed. 1970); Sammons, "Ethical Issues in Genetic Intervention", 23 *Soc. Work* 237, 238 (1978). This, I believe, is the crux of the wrong done in this case. Through the failure of the doctors to advise an expectant mother, and father, of the likelihood or certainty of the birth of a mongoloid child, the parents were given no opportunity to cushion the blow, mute the hurt, or prepare themselves as parents for the birth of their seriously impaired child. Their injury is real and palpable. *Cf. Graf v. Taggert, supra.* Moreover, it is not easy to overcome these feelings or adjust to the tragedy of having a defective child. It is recognized that a mother, even in normal circumstances, may suffer depressive and negative feelings upon the birth of a healthy child. If her psychological state has been further impaired by the shock of the birth of a defective child her recovery may well be even more prolonged and dubious. Olshansky, "Chronic Sorrow: A Response to Having a Mentally Defective Child", 43 *Soc. Casework* 171, 192 (1962) ; Griffin, Kavanagh & Sorenson, "Genetic Knowledge, Client Perspectives, And Genetic Counselling," *supra* at 175. In any given case, the mental and emotional suffering of parents might continue for some period of time beyond the birth of a child and should be recognized as an important aspect of the parents' injury. *Cf. Friel v. Vineland Obst. and Gynecological Professional Assoc., supra.*

Because of the unique nature of the tort, involving as it does the denial of the opportunity to decide whether to become the parents of a handicapped child, the suffering of the parents assumes another, important dimension. There should be recognized in the stressful setting of this case the reality

of moral injury. Such injury may be thought of as the deprivation of moral initiative and ethical choice. *Cf. Gleitman v. Cosgrove, supra,* 49 *N. J.* at 64–65 (Weintraub, C. J., concurring and dissenting). Persons, confronted with the awesome decision of whether or not to allow the birth of a defective child, face a moral dilemma of enormous consequence. They deal with a profound moral problem. See *e. g.,* Englehardt, "The Ontology of Abortion", 84 *Ethics* 217 (1974) ; Newton, Humans and Persons: A Reply to Tristain Englehardt", 85 *Ethics* 332 (1975). To be denied the opportunity — indeed, the right — to apply one's own moral values in reaching that decision, is a serious, irreversible wrong. *Cf. In re Quinlan,* 70 *N. J.* 10 (1976). Shorn of ethical choice in bringing into the world a defective human being, some individuals will be torn by moral conflict. Moral suffering in this sense may be felt keenly by a person who, as a matter of personal conscience, would choose not to allow the birth of such a child. Wolfensberger & Menolascino, "A Theoretical Framework for the Management of Parents of the Mentally Retarded", *supra* at 478. The moral affront, however, is not diminished because the parents, if given the choice, would have permitted the birth of the child. The crucial moral decision, which was theirs to make, was denied them.

A full perception of the mental, emotional — and, I add, moral — suffering of parents in this situation reveals another aspect of their loss. Mental, emotional and moral suffering can involve diminished parental capacity. Such incapacity of the mother and father *qua* parents is brought about by the wrongful denial of a reasonable opportunity to learn of and anticipate the birth of a child with permanent defects, and to prepare for the heavy obligations entailed in rearing so unfortunate an individual. Such parents may experience great difficulty adjusting to their fate and accepting the child's impairment as nature's verdict. Wolfensberger & Menolascino, "A Theoretical Framework for the Management of Parents of the Mentally Retarded", *supra* at 479. While some indi-

viduals confronted by tragedy respond magnificently and become exemplary parents, others do not. See *e. g.*, *Becker v. Schwartz*, 46 *N. Y.* 2d 401, 413 *N. Y. S.* 2d 895, 386 *N. E.* 2d 807 (Ct. App. 1978) in which the parents subsequently put their mongoloid child up for adoption, *N. Y. Times*, Feb. 17, 1979, at 23, col. 1. Individuals suffering this form of parental incapacity or dysfunction are denied to a great extent the fuller joys, satisfaction and pride which comes with successful and effective parenting. This may endure for some time during the early developmental years of the child. Griffin, Kavanagh & Sorenson, "Genetic Knowledge, Client Perspectives, And Genetic Counseling", *supra* at 175; Olshansky, "Chronic Sorrow: A Response to Having a Mentally Defective Child", *supra* at 192. Impaired parenthood, so understood, constitutes another dimension of the injury and loss suffered by plaintiffs in this case. In this sense, impaired parenthood, together with mental and emotional and moral suffering, should be recognized and compensated as elements of damages.

## III

The Court in this case, as in *Gleitman* before it, fails to accord a cause of action to the afflicted infant plaintiff. This denial, I most respectfully urge, is wrong.

The Court proceeds on the notion that the claims of the infant plaintiff are based on her "wrongful life". "[T]he gist of the infant's complaint is that had defendants informed her mother of the availability of amniocentesis, Sharon would never have come into existence". *Ante* at 426. It is acknowledged by the majority that this thesis — injury consisting of a wrongful life — poses insuperable analytical problems in admeasuring damages. "[P]lacing a value upon non-life is not simply difficult — it is humanly impossible." *Ante* at 428. Nevertheless, the Court does not rest its rejection of the infant's claim upon the inordinate difficulty of measuring damages for her "wrongful life", as did the Court in *Gleit-*

*man.* Rather, the Court now says: "[As a matter of law,] Sharon has not suffered any damage cognizable [in] law by being brought into existence." *Ante* at 429. Sharon, the Court states, has been given life and even with a handicap it "is more precious than non-life." *Id.*

An adequate comprehension of the infant's claims under these circumstances starts with the realization that the infant has come into this world and is here, encumbered by an injury attributable to the malpractice of the doctors. That injury does not consist of the child's afflicted condition; her affliction was not the doctor's doing. Rather, the injury consists of a diminished childhood in being born of parents kept ignorant of her defective state while unborn and who, on that account, were less fit to accept and assume their parental responsibilities. The frightful weight of the child's natural handicap has been made more burdensome by defendants' negligence because her parents' capacity has been impaired; they are less able to cope with the extra-heavy parental obligations uniquely involved in providing a child so afflicted with the unfaltering love, constant devotion and extraordinary care such a child specially requires.

There has been some judicial appreciation of the notion that a diminished childhood may be the consequence of impaired parental capacity. In *Berger v. Weber,* 82 *Mich. App.* 199, 267 *N. W.* 2d 124 (Ct. App. 1978), the Court recognized a cause of action in a suit brought by a mentally retarded child to recover damages for the loss of society, companionship, love and affection of her mother as a result of injuries sustained by the mother in an auto accident. The mother had sustained both physical and psychological injuries and could no longer continue to administer to the peculiar needs of her retarded daughter. The Court upheld a cause of action for such losses when a parent is "severely" injured. It recognized that the loss of parental guidance and training can have a severe impact on a child's development and personality and found the reasons for denying a cause of action, such as lack of precedent, uncertainty of damages, possibility

of double recovery and potential for a multiplicity of suits, unpersuasive. The Court also thought it anomalous to say that a child suffers a compensable loss in a wrongful death action when the parent is killed but not when a parent is injured so severely that he or she cannot perform the parental function. It concluded that the magnitude of the child's loss outweighs the factors which would militate against allowing recovery. *Cf. Scruggs v. Meredith,* 134 *F. Supp.* 868 (D. Haw. 1955), rev'd *sub nom. Meredith v. Scruggs,* 244 *F.* 2d 604 (9 Cir. 1957).

Plausibly, the child's injury and loss in the form of diminished childhood can be viewed as a derivative claim based solely on the parents' injury. The great majority of jurisdictions which have considered a child's cause of action for damages as derivative from injuries negligently inflicted on a parent have generally rejected such claims. This, in fact, was the unanimous holding of the Court in *Russell v. Salem Transportation Co., Inc.,* 61 *N. J.* 502 (1972). The reasons for denying recognition of such a cause of action in *Russell* were several. The Court felt that the damages to the child were remote and speculative and feared a substantial accretion of liability against a tortfeasor from a single transaction, a possibility of a double recovery in that consequential damages to children from a parent's accident are frequently already compensated in jury awards and conflicts within families in relation to the apportionment of settlement offers. Similar reasons for denying recovery have been articulated in other cases as well. See *Borer v. American Airlines, Inc.,* 19 *Cal.* 3d 441, 138 *Cal. Rptr.* 302, 563 *P.* 2d 858 (Sup. Ct. 1977); *Priola v. Paulino,* 72 *Cal. App.* 3d 380, 140 *Cal. Rptr.* 186 (Ct. App. 1977). On the other hand, serious misgivings with that result have been expressed from time to time. *E. g., Hoffman v. Dautel,* 189 *Kan.* 165, 368 *P.* 2d 57 (Sup. Ct. 1962); *Hill v. Sibley Memorial Hospital,* 108 *F. Supp.* 739 (D. D. C. 1952). According to *W. Prosser, Law of Torts* (4th ed. 1971) § 125, pp. 896–897 (fns. omit.):

It is not easy to understand and appreciate this reluctance to compensate the child who has been deprived of the care, companionship and education of his mother, or for that matter his father, through the defendant's negligence. This is surely a genuine injury, and a serious one, which has received a great deal more sympathy from the legal writers than from the judges. There is of course the * * * problem of preventing double compensation * * *, since the child will to some extent benefit by any sum recovered by the injured parent; but it is quite evident that this will not and cannot recompense him for all that he has lost. The obstacles in the way of satisfactory limitation of recovery are no greater than in the case of the wife [suing for loss of consortium]. As has been said even by one court which considered itself forced to deny recovery, it is difficult "on the basis of natural justice to reach the conclusion that this type of action will not lie". It is particularly difficult when recovery is permitted to the wife, but denied to the child.

Solution to this legal conundrum — whether and how to protect the infant's interests — should not turn on labels or definitions It is to be emphasized in this case that the doctors' medical malpractice encompasses the child. See *Smith v. Brennan*, 31 *N. J.* 353 (1960) ; *Knutsen v. Brown, et al.*, 93 *N. J. Super.* 522 (Law Div. 1966), aff'd 96 *N. J. Super.* 229 (App. Div. 1967) ; see also, *Graf v. Taggert, supra*. Their negligence consists of the failure to render proper advice to Mrs. Berman as an *expectant* mother. Indisputably in this relationship the doctors were caring for the unborn child as well as the mother; the duty they owed Mrs. Berman enveloped a duty to the unborn child. The breach of that duty affects both. "The risk created by a negligent act of one who stands in a physician-patient relationship is of enormous consequence to mother and child." *Friel v. Vineland Obst. and Gynecological Professional Assoc., supra*, 166 *N. J. Super.* at 591. Justice Jacobs offered a similar observation, dissenting in *Gleitman*: "While the wrong was done directly to Mrs. Gleitman, in truth and reality it vitally affected her entire immediate family." 49 *N. J.* at 50. *Cf. Small v. Rockfeld*, 66 *N. J.* 231, 246–248 (1974) ; *In re Adoption of J. by J. and A.*, 139 *N. J. Super.* 533 (App. Div. 1976), rev'd on other grounds 73 *N. J.* 68

(1977); *Hankins v. Derby,* 211 *N. W.* 2d 581, 582–583 (Iowa Sup. Ct. 1973).

No one is contending that any medical procedure consistent with sound medical practice would have served to avert or lessen the physicial defects of the infant, which she acquired congenitally, at the moment of conception. But the duty here owed was that of advising the parents fully as to the probability of the impaired physical condition of their unborn child and of the availability of a test which could have proved or disproved that medical prediction. The negligent breach of that duty carried with it the foreseeable consequence that the impaired infant would be born of parents whose parental fitness would be seriously undermined as a result of this professional mishandling, with the equally foreseeable result that the unborn child would be burdened with a diminished childhood. *Cf. Smith v. Brennan, supra.*

There should be no insurmountable legal obstacle in recognizing and vindicating the infant's cause of action. It is true that courts have often rejected compensatory damages on behalf of infants of injured parents because of the remoteness or speculative nature of such damages as well as the possibility of double recoveries against the same defendant. *E. g. Russell v. Salem Transportation Co., Inc., supra; Erhardt v. Havens, Inc.,* 53 *Wash.* 2d 103, 330 *P.* 2d 1010 (Sup. Ct. 1958). The first category of problems presents no impenetrable barrier to recovery, as already explained. As to the second, concededly, the kind of injury suffered by the child in this context may not be readily divisible from that suffered by her wronged parents. There is nevertheless an intelligible distinction between a parent whose loss may involve the unhappiness, frustration and guilt which stem from inadequate parental performance, and the child whose loss is in lessened parental love, devotion and care. It would be unjust not to recognize the child's loss as compensable. As Justice Jacobs stressed in *Gleitman,* "such compensation as is received from the defendants * * * should be dedicated primarily to [the infant's] care and the lessening

of [her] difficulties." 49 *N. J.* at 50. To the extent the child's loss may mirror that of the parents, the court can avoid duplicating compensation by careful instructions to the jury, special interrogatories and by the molding of any award.

Clearly the doctors owed a professional duty of care to all of the plaintiffs in this case, the child while unborn as well as her parents. The breach of this duty resulted in discernible injuries to each of the plaintiffs. Some of these losses, those of the parents in the form of mental, emotional and moral injury and impaired parenthood and those of the child in the nature of a diminished childhood, might be hard to sense, difficult to define and puzzling to evaluate. They are, nonetheless, actual and constitute a sound basis for a lawful claim for redress and compensation. I would reverse the summary judgment and remand the litigation to allow the parties to marshall evidence relevant to these issues.

Accordingly, I concur and dissent in part.

*For affirmance as to infant and reversal and remandment as to parents*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER—6.

*For reversal as to infant and reversal and remandment as to parents*— Justice HANDLER—1.