388 So.2d 1084 (1980)
PUBLIC HEALTH TRUST, Richard Auclair, M.D., and Glenn Salkind, M.D., Appellants,
v.
Susan BROWN, Appellee.
No. 79-2069.
District Court of Appeal of Florida, Third District.
October 7, 1980.
Rehearing Denied October 24, 1980.
Fowler, White, Burnett, Hurley, Banick & Strickroot and Henry Burnett, Miami, for appellants.
Mandina & Lipsky and Michael A. Lipsky, Miami, for appellee.
Before SCHWARTZ, NESBITT and DANIEL S. PEARSON, JJ.
SCHWARTZ, Judge.
This case of first impression in the Florida appellate courts[1] presents the fascinating question of whether the cost of raising a previously unwanted but healthy and normal child is a recoverable element of damages in a so-called "wrongful birth" case. We conclude that it is not.
The issue comes to us in a pristine legal form, uncluttered by any procedural or factual complexity. A jury found that physician-employees of Jackson Memorial Hospital *1085 had negligently performed a tubal ligation on Susan Brown, with the result that she became pregnant and delivered her sixth child, Lamont.[2] She was awarded $10,837 for the medical expenses, lost wages and pain and suffering caused by the undesired pregnancy and the process of childbirth. The appellants challenge neither the liability finding nor the award of these items of damages. Their sole appellate point concerns the inclusion in the final judgment of $19,500 which, in a special verdict, was assessed for the past and discounted future
"reasonable costs of raising Lamont Brown to age 18, offset by the value of his love and affection, companionship and the other mother-child relationships."
In holding that such a claim should not be recognized, we align ourselves with a clear majority of courts in other jurisdictions which have decided the identical question. Coleman v. Garrison, 349 A.2d 8 (Del. 1975); Wilczynski v. Goodman, 73 Ill. App.3d 51, 29 Ill.Dec. 216, 391 N.E.2d 479 (1979); Berman v. Allan, 80 N.J. 421, 404 A.2d 8 (1979); Sala v. Tomlinson, 73 A.D.2d 724, 422 N.Y.S.2d 506 (1979); Terrell v. Garcia, 496 S.W.2d 124 (Tex.Civ.App. 1973), cert. denied, 415 U.S. 927, 94 S.Ct. 1434, 39 L.Ed.2d 484 (1974); Rieck v. Medical Protective Co. of Fort Wayne, Ind., 64 Wis.2d 514, 219 N.W.2d 242 (1974); see, Shaheen v. Knight, 6 Lycoming Rptr. 19, 11 Pa. D. & C.2d 41 (1957); Ball v. Mudge, 64 Wash.2d 247, 391 P.2d 201 (1964); contra, Stills v. Gratton, 55 Cal. App.3d 698, 127 Cal. Rptr. 652 (1976); Custodio v. Bauer, 251 Cal. App.2d 303, 59 Cal. Rptr. 463 (1967); Anonymous v. Hospital, 33 Conn.Sup. 126, 366 A.2d 204 (1976) (relying on Delaware lower court decision reversed in Coleman v. Garrison, supra); Troppi v. Scarf, 31 Mich. App. 240, 187 N.W.2d 511 (1971); Sherlock v. Stillwater Clinic, 260 N.W.2d 169 (Minn. 1977); but see, Bishop v. Byrne, 265 F. Supp. 460 (S.D.W. Va. 1967); Bowman v. Davis, 48 Ohio St.2d 41, 356 N.E.2d 496 (1976). See generally, Annot., Tort Liability for Wrongfully Causing One to Be Born, 83 A.L.R.3d 15 (1978); Comment, Wrongful Conception: Who Pays for Bringing up Baby?, 47 Fordham L.Rev. 418 (1978); Kashi, The Case of the Unwanted Blessing: Wrongful Life, 31 U.Miami L.Rev. 1409 (1977).
There is no purpose to restating here the panoply of reasons which have been assigned by the courts which follow the majority rule. See especially the comprehensive discussions in Wilczynski v. Goodman, supra and Berman v. Allan, supra. In our view, however, its basic soundness lies in the simple proposition that a parent cannot be said to have been damaged by the birth and rearing of a normal, healthy child.[3] Even the courts in the minority recognize, as the jury was instructed in this case, that the costs of providing for a child must be offset by the benefits supplied by his very existence. Stills v. Gratton, supra; Anonymous v. Hospital, supra; Troppi v. Scarf, supra; Sherlock v. Stillwater Clinic, supra. See, Restatement (Second) of Torts § 920 (1979). But it is a matter of universally-shared emotion and sentiment that the intangible but all-important, incalculable but invaluable "benefits" of parenthood far outweigh any of the mere monetary burdens *1086 involved.[4] See, Shaheen v. Knight, supra; Terrell v. Garcia, supra. Speaking legally, this may be deemed conclusively presumed by the fact that a prospective parent does not abort or subsequently place the "unwanted" child for adoption. See, e.g., Shaheen v. Knight, supra; Rieck v. Medical Protective Co., supra. On a more practical level, the validity of the principle may be tested simply by asking any parent the purchase price for that particular youngster. Since this is the rule of experience, it should be, and we therefore hold that it is, the appropriate rule of law. It is a rare but happy instance in which a specific judicial decision can be based solely upon a reflection of one of the humane ideals which form the foundation of our entire legal system. This, we believe, is just such a case.
The judgment under review is reduced by $19,500 and, as so modified, is affirmed.
Affirmed in part, reversed in part.
DANIEL S. PEARSON, Judge, dissenting.
I respectfully dissent. I am confident that the majority recognizes that any decision based upon a notion of public policy is one about which reasonable persons may disagree. Any doubt I might have is dispelled by the fact, as evidenced in the majority opinion, that there exists substantial disagreement among the courts of other states which have heretofore been called upon to decide whether public policy prevents a parent from recovering damages attendant upon the rearing of a child.
Because I am of the view that judges are more to be trusted as interpreters of the law than as expounders of what is called public policy, Re Mirams, 1 Q.B. 594, 595 (1891), I cannot join in the majority's declaration that, as a matter of public policy, and therefore as a matter of law, the benefits derived from parenthood exceed any damages which will be incurred in raising an unplanned child whose birth comes about through the negligence of another. I am persuaded that a jury properly instructed, as was the jury in the present case, that it could award damages for the
"cost of raising the child ... in the future, offset by the value of his love and affection, companionship and the other mother-child relationships... ."[1]
will better express the view and conscience of the community, can measure on a case-by-case basis the enormously varied claims which may arise, and can assess the extent to which the benefits of parenthood should reduce the costs of raising a child.
A judicial declaration of pre-emptive public policy should express the manifest will of the people. Troppi v. Scarf, 31 Mich. App. 240, 187 N.W.2d 211 (1971). The majority's conclusion that the benefits of parenthood in every case outweigh the costs of raising a child is totally inconsistent with the manifest will of, at least, the six jurors who decided the present case. I regard the jury's decision as a far more accurate declaration of the will of the people than the majority's decision.
The majority arrives at its assessment of the will of the people by positing that "it is a matter of universally shared emotion and sentiment that the intangible but all-important, incalculable but invaluable `benefits' of parenthood far outweigh any of the *1087 mere monetary burdens involved."[2] It is this very same emotion and sentiment that leads a parent to say that he or she would not part with the child for any price and would not consider placing the unplanned child for adoption.[3] But this response, psychologically and socially compelled, and concededly based on emotion and sentiment, cannot be given an arbitrary value which will always exceed the cost of raising a child, and thereby be used to fashion a rule which precludes recovery of proximately caused and foreseeable damages.[4]
There is a bitter irony in the rule of law announced by the majority. A person who has decided that the economic or other realities of life far outweigh the benefits of parenthood is told by the majority that the opposite is true.[5] Yet if we cannot interfere with an individual's choice to forego the benefits of parenthood, see, e.g., Planned Parenthood of Missouri v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), by what reasoning can the majority arrive at a rule, based on public policy, which effectively nullifies the individual's choice?
I have previously admitted that I have no special capacity to intuit, and am possessed of no extensive empirical evidence from which I can infer, the manifest will of the people. The majority, I submit, has failed to observe the caveat that public policy "... is a very unruly horse, and when once you get astride it, you never know where it will carry you. It may lead you from the sound law." Richardson v. Mellish, 2 Bing. 229, 252 (1824), quoted with approval in Story v. First National Bank and Trust Company in Orlando, 115 Fla. 436, 156 So. 101 (1934). Having, in my view, been led from the sound law, the majority couches its result as humane. I dissent from that as well.[6] I firmly believe that the result reached by the majority in the name of humaneness is, unwittingly, inhumane. I see nothing humane in denying a parent the wherewithal which might save a child from deprivation or, in many cases, abject poverty. I see nothing humane in a rule of law that could enhance the already dire need of parents and existing siblings. I see nothing humane in a decision which effectively immunizes physicians from their negligence and victimizes a mother who sought to relieve herself and her family from the additional burden of another child. I would affirm the decision below.
NOTES
[1] The damage issue was specifically reserved in Jackson v. Anderson, 230 So.2d 503 (Fla.2d DCA 1970), which was the first Florida decision to recognize the right to recover for a negligent sterilization which does not achieve the desired result. Cf., Aronoff v. Snider, 292 So.2d 418 (Fla.2d DCA 1974) (no cause of action in siblings of "wrongfully born" child). In Bradian v. Baliton, 48 Fla. Supp. 201 (Fla. 19th Cir. Ct. 1979), a Florida trial court struck the damage element involved in this case.
[2] Mrs. Brown stated that Lamont, who was almost two at the time of trial, was a fine and healthy little boy whom she loved very much-just as she did her other children. While she had considered an abortion, she was glad that she had decided against it.
[3] Because the issue is not before us, we do not decide nor intimate a view as to the recoverability of the costs involved in treating and raising an abnormal or unhealthy child. Compare, Sala v. Tomlinson, supra (no recovery for healthy child); Shaheen v. Knight, supra (same); Terrell v. Garcia, supra (same); and Rieck v. Medical Protective Co., supra (same); with Becker v. Schwartz, 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978) (recovery permitted for costs required for abnormal child); Speck v. Finegold, ___ Pa.Super. ___, 408 A.2d 496 (1979) (same); Jacobs v. Theimer, 519 S.W.2d 846 (Tex. 1975) (same); Dumer v. St. Michael's Hospital, 69 Wis.2d 766, 233 N.W.2d 372 (1975) (same); and Berman v. Allan, supra (no recovery for raising either healthy or abnormal child); with Bowman v. Davis, supra (recovery permitted for raising both healthy and abnormal child).
[4] We note that, under the contrary view, an unhandsome, colicky or otherwise "undesirable" child would provide fewer offsetting benefits, and would therefore presumably be worth more monetarily in a "wrongful birth" case. The adoption of that rule would thus engender the unseemly spectacle of parents disparaging the "value" of their children or the degree of their affection for them in open court. It is obvious, whether the conclusion is phrased in terms of "public policy," see, Raisen v. Raisen, 379 So.2d 352 (Fla. 1979), or otherwise, that such a result cannot be countenanced.
[1] This instruction follows the view expressed in Section 920, Restatement (Second) of Torts (1979), which provides:

"Where the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred upon the plaintiff a special benefit to the interest which was harmed, the value of the benefit conferred is considered in mitigation of damages, where this is equitable." (emphasis supplied).
[2] The same might be said to deny government sponsored financial aid to parents who are unable to provide for their children. It would seem that the public policy expressed in the welfare programs is to place no financial value on these "benefits."
[3] "Many parents feel a moral sense of obligation to bring up as best they can a child unwanted at the time of conception." Stills v. Gratton, 55 Cal. App.3d 698, 707, 127 Cal. Rptr. 652, 658 (1976) (emphasis supplied).
[4] The argument has been made that since, under Restatement (Second) of Torts, see n. 1, supra, the benefit to be considered in mitigation must be "to the interest which is harmed," emotional rewards cannot mitigate injured financial interests. The services which a parent can expect a child to render, upon which a financial value can be placed, are largely illusory.
[5] "It is no answer to say that a result which [the plaintiff] specifically sought to avoid might be regarded as a blessing by someone else." Rivera v. State, 94 Misc.2d 157, 162, 404 N.Y.S.2d 950, 954 (Ct.Cl. 1978).
[6] I am content to keep my response within the parameters of the majority opinion. The various arguments in favor of and against the rule adopted by the majority are found in the cases cited in the majority opinion.