[No. 21883-2-I. Division One. June 12, 1989.]

ROBERT D. MOORMAN, *Appellant,* v. TRACY ANNETTE WALKER, *Respondent.*

*Pamela D.O. Larson,* for appellant.

*Paul E. Simmerly,* for respondent.

WEBSTER, J.—Robert Daniel Moorman appeals a summary judgment dismissal of his misrepresentation claim against Tracy Annette Walker. Moorman claims that Walker intentionally or negligently misled him to believe she could not become pregnant. Walker became pregnant, and now Moorman has to pay child support.

Walker cross–appeals a denial of her posttrial motion for attorney fees and costs pursuant to RCW 4.84.185. Walker also seeks fees and costs on this appeal pursuant to RAP 18.9. We affirm, and deny Walker's request for fees and costs.

### FACTS

Walker's deposition reveals that she married another man in August 1981. She and her husband tried without success to conceive a child.

In September 1983, Walker sought professional help. She visited a doctor on September 1, 1983, because of irregular

uterine bleeding. Walker mentioned she had been unable to conceive for 3 years. The doctor determined the irregular bleeding was due to a failure to ovulate. He believes he told Walker she "probably would not be able to conceive as long as her periods remained irregular" which they apparently would "without some medication." He did not say that Walker could *not* get pregnant, but concedes, "many times people interpret things that way. In fact, that's probably one of the commonest areas of misinterpretation from a patient's point of view".

The doctor gave Walker a 1–month supply of fertility medication and told her she would need to be seen on a monthly basis if she expected to conceive. Walker apparently took the first month's dose, because she returned for a second. However, she did not return again and· received "two months treatment only".

Walker divorced in February 1984 and started seeing Moorman on a daily basis in the spring. Moorman made it very clear that he did not want to have children out of wedlock. He felt very strongly about this. Moorman maintains that Walker said she had endometritis, a condition which renders women infertile.

Walker denies she ever mentioned endometritis or any other medical terminology to describe her condition. She claims she mentioned only that her doctor said she could not get pregnant. She explained that she had previously taken fertility medication which did not work. The next step was to have dye injected into her fallopian tubes. She said she decided against this or any further fertility treatment.

Both parties believed Walker to be infertile and decided not to use contraceptives. Walker became pregnant in the fall of 1984, and gave birth to a healthy boy on May 14, 1985.

## No Cause of Action

The record arguably supports Moorman's claim that Walker intentionally misrepresented her ability to conceive.

We therefore assume for purposes of our decision that she did.

In *Linda D. v. Fritz C.*, 38 Wn. App. 288, 293, 687 P.2d 223, *review denied*, 102 Wn.2d 1024 (1984), the court held that an identical misrepresentation claim could not be raised as a counterclaim to an action for child support under the Uniform Parentage Act. The court expressly limited its discussion to the relevance of a misrepresentation claim such as Moorman's in the context of a paternity action. *Linda D.*, at 293–96. Here, Moorman does not dispute his obligation to pay child support. "Procedurally and technically" Moorman's claim is "separate and apart from any issue of either parent's obligation to raise and support the child." *See Stephen K. v. Roni L.*, 105 Cal. App. 3d 640, 643, 164 Cal. Rptr. 618, 619 (1980). Thus, *Linda D.* does not control.

■ Still, parents of a normal, healthy child may not recover the costs of raising the child or damages for the "emotional burdens" of parenthood when a surgeon negligently and unsuccessfully performs a sterilization operation. *See McKernan v. Aasheim*, 102 Wn.2d 411, 687 P.2d 850 (1984). The reason for this rule is twofold. First, parents of a normal, healthy child cannot establish the *fact* of damage with reasonable certainty. *McKernan*, at 419. "A child is born—how can it be said within the ambit of legal predictability that the monetary cost of that life is worth more than its value?" *McKernan*, at 420 (quoting *Coleman v. Garrison*, 349 A.2d 8, 12 (Del. 1975). Second, allowing recovery would brand the child an "emotional bastard". *McKernan*, at 416, 421.

> [A]n unhandsome, colicky or otherwise "undesirable" child would provide fewer offsetting benefits, and would therefore presumably be worth more monetarily in a "wrongful birth" case. The adoption of that rule would thus engender the unseemly spectacle of parents disparaging the "value" of their children or the degree of their affection for them in open court. It is obvious, whether the conclusion is phrased in terms of "public

policy," or otherwise, that such a result cannot be countenanced.

*McKernan,* at 420 (quoting *Public Health Trust v. Brown,* 388 So. 2d 1084, 1086 n.4 (Fla. Dist. Ct. App. 1980)).

Though *McKernan* is factually distinguishable, the same logic and public policy considerations apply to Moorman's suit. First, it is impossible to say that Moorman has been damaged.

Perhaps the costs of rearing and educating the child could be determined through use of actuarial tables or similar economic information. But whether these costs are outweighed by the emotional benefits which will be conferred by that child cannot be calculated. The child may turn out to be loving, obedient and attentive, or hostile, unruly and callous. The child may grow up to be President of the United States, or to be an infamous criminal. In short, it is impossible to tell, at an early stage in the child's life, whether its parents have sustained a net loss or net gain.

*McKernan,* at 419–20. Second, public policy will not permit parents to disparage their child by claiming "in open court" that the child's existence has damaged them. *McKernan,* at 420.

[T]he simple fact that the parents saw fit to allege their child as a "damage" to them would carry with it the possibility of emotional harm to the child. We are not willing to sweep this ugly possibility under the rug by stating that the *parents* must be the ones to decide whether to risk the emotional well being of their unplanned child.

(Italics ours.) *McKernan,* at 421. Parents must put their children's interests above their own. Justice demands this, because parents exercise a choice in their child's creation, whereas the child has none. We simply will not collaborate in conduct that disparages an innocent child.

An additional public policy consideration that was not present in *McKernan* is applicable here. "We are in effect asked to attach tortious liability to the natural results of consensual sexual intercourse." *See Stephen K.,* at 643. In no prior case has one sought "so radical a change in the

socially accepted ideas and views of sexual conduct, family relationship, parental obligations, and legal and moral responsibility". *Stephen K.,* at 643.

> [A]lthough [the defendant] may have lied and betrayed the personal confidence reposed in her by [the plaintiff], the circumstances and the highly intimate nature of the relationship wherein the false representations may have occurred, are such that a court should not define any standard of conduct therefor.

*Stephen K.,* at 643. Contracts are voidable for fraud or misrepresentation, but the moral responsibility for creating a human life is not voidable as if sex were a simple contractual transaction. We can no more recognize a lawsuit which trivializes the responsibility for consensual sex than we can one which trivializes life itself.

### ATTORNEY FEES AND COSTS

■ Cases of first impression that present debatable issues of substantial public importance are not frivolous. *Linda D. v. Fritz C.,* 38 Wn. App. at 301. This is such a case.

The sole case relied upon by Walker at trial and on this appeal, *Linda D.,* does not foreclose Moorman's claim. Only a handful of courts have addressed similar facts. *See* Annot., *Misrepresentation Regarding Sterility or Use of Birth Control,* 31 A.L.R.4th 389 (1984 & 1988 Supp.). Only one of these cases, *Stephen K.,* has not qualified its holding, as did *Linda D.* by reference to a paternity context. All of the cases are the subject of a growing number of law review articles, and at least one of the articles takes the position that summary judgment should not be routinely granted. *See* P. Murray & B. Winslett, *The Constitutional Right to Privacy and Emerging Tort Liability for Deceit in Interpersonal Relationships,* 1986 U. Ill. L. Rev. 779. The article rejects the privacy argument advanced in *Stephen K.* and concludes instead that "the only legitimate grounds upon which courts may deny a tort cause of action for an unwanted pregnancy are public policy considerations as to the plight of undesired children . . .". 1986 U. Ill. L. Rev.

at 781. The authors opt for a case–by–case assessment of damages—an alternative which we reject in view of *McKernan.*

Because of the novelty of Moorman's claim, Walker can hardly argue that the trial court abused its discretion in denying her motion for attorney fees or costs pursuant to RCW 4.84.185 and CR 11. Also, because Moorman's appeal is not frivolous, and it does not otherwise appear that he prosecuted it "for the purpose of delay," Walker is not entitled to an award of fees and costs on this appeal pursuant to RAP 18.9.

Affirmed.

COLEMAN, C.J., and REVELLE, J. Pro Tem., concur.

Review denied at 113 Wn.2d 1012 (1989).