209 N.J. Super. 300 (1986)
507 A.2d 718
GORDON G. STRACHAN AND MARILYN STRACHAN, HIS WIFE, PLAINTIFFS-RESPONDENTS,
v.
JOHN F. KENNEDY MEMORIAL HOSPITAL AND A.R. PIROLLI, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 9, 1985.
Decided March 17, 1986.
*303 Before Judges MORTON I. GREENBERG, J.H. COLEMAN and LONG.
Stacy L. Moore, Jr., argued the cause for appellants (Parker, McCay & Criscuolo, attorneys; Stacy L. Moore, Jr., on the brief).
P. Kay McGahen argued the cause for respondents (McGahen, Dempsey & Casey, attorneys; P. Kay McGahen, on the brief).
The majority opinion of the court was delivered by COLEMAN, J.H., J.A.D.
The novel issues presented in this tragic right to die case are (1) whether the hospital wrongfully delayed a decent burial of a brain dead patient, and (2) whether plaintiffs, as bystanders, established a valid claim for negligent infliction of emotional distress by the hospital for its alleged failure to have in place a procedure for discontinuing, upon request, life support systems on a brain dead patient. A jury found the hospital liable under both theories and awarded damages of $70,000 on each theory (which totals $140,000) for infliction of additional emotional distress. Defendants' motion for a new trial was denied. The hospital and its administrator have appealed. We hold that plaintiffs, as matter of law, did not establish any actionable wrongdoing under either theory of liability. We therefore reverse and enter judgment for defendants.
*304 The present action was instituted by plaintiffs, the parents of a suicide victim. The complaint alleged that John F. Kennedy Memorial Hospital; its administrator, A.R. Pirolli; Drs. Hummel, Weinstein, Cohen, Venkat, Pinzler, Santoro; three Drs. John Doe; and the Delaware Valley Transplant Program and its representative Stephen Sammut were negligent, had committed the tort of outrage and were "responsible for grossly inappropriate handling of the dead body of Jeffrey Strachan." The alleged negligence was predicated upon the failure of the hospital to have in place procedures for withdrawing life support systems from a brain dead patient upon the request of the family. Plaintiffs sought compensatory and punitive damages. The complaint against all defendants, except for the hospital and its administrator, was dismissed prior to trial based upon the court's holding that as matter of law, there was no breach of any duty by those defendants. No appeal has been taken from that determination.

I

FACTUAL BACKGROUND
The facts essential to our determination begin with the tragic events of Friday, April 25, 1980 when 20 year old Jeffrey Strachan undertook to commit suicide. At about 4:30 p.m., he fired a .38 caliber bullet into his head. He was transported by ambulance to defendant-hospital. An examination in the emergency room at 5:00 p.m. revealed a gun shot wound to the head. X-rays showed that the bullet had entered the right parietal area and was lodged in the left temporal region. Jeffrey was comatose but still had spontaneous respiration. He was intubated by Dr. Hummel, the emergency room physician. At 5:25 p.m. there was no spontaneous respiration; both pupils were dilated and fixed and no reflexes were detected. Jeffrey was then placed on a respirator (life support systems). Based upon a clinical examination, Dr. Hummel found Jeffrey to be brain dead.
*305 At about 8:10 p.m. that same day, Jeffrey was examined by Dr. Cohen, a neurosurgeon, who also found Jeffrey to be clinically brain dead. Dr. Cohen explained to plaintiffs that Jeffrey was brain dead and that there was not anything that could be done to restore brain function. Dr. Cohen asked plaintiffs if they would consider donating Jeffrey's organs, such as his kidneys, for transplant purposes. The plaintiffs were not in agreement on whether to donate organs. Dr. Cohen suggested that plaintiffs should go home and return the next morning with a decision. At 8:30 p.m. Jeffrey was transferred to the intensive care unit where he continued to be on the life support systems and to receive other forms of active medical care. By this time his skin was pale, but he was still warm to the touch.
Plaintiffs returned to the hospital on Saturday, April 26, 1980 at about 9:00 a.m. They informed Dr. Pinzler that they had decided not to donate any of Jeffrey's organs and that they wanted the respirator turned off. Dr. Pinzler advised them to think it over some more. The hospital records indicate that plaintiffs' request was discussed with Dr. Cohen. The hospital record does not, however, disclose the content of that conversation. At about noon, Mr. Strachan asked a nurse if the respirator was going to be turned off and she replied in the negative, stating that "nobody had ever asked to have a machine shut off." Plaintiffs left the hospital at about lunch time.
Plaintiffs returned to the hospital at about dinner time and Mr. Strachan spoke with Dr. Venkat, one of Dr. Cohen's associates. Dr. Venkat examined Jeffrey at 8:00 p.m. and agreed that he was brain dead. Mr. Strachan asked Dr. Venkat to turn off the respirator because the nurses had said that they had no power to remove the life support systems. Dr. Venkat noted in the patient's chart that "as soon as the hospital administrator tells us the procedure, we will do so." The hospital administrator was contacted by the hospital. Based on conversation with administrator Pirolli, plaintiffs were advised at about 2:00 a.m. *306 on Sunday, April 27, that a court order would be required before the life support systems could be disconnected.
The evidence is somewhat in conflict as to what was done by the hospital administrator in response to requests for him to outline the procedure, if any, which the hospital required physicians to follow before turning off the life support systems on a brain dead patient. Pirolli was not on duty on the Saturday afternoon and evening of April 26, 1980. Jeannette Licorice, the assistant hospital administrator and director of nursing, was on call that weekend. She was advised by the nursing supervisor that plaintiffs would not agree to donate Jeffrey's organs and that they wanted the life support systems discontinued. She was told that Jeffrey was found to be brain dead from clinical examinations but that no electroencephalagram (EEG) had been performed. Later that night she spoke with Pirolli and informed him of Jeffrey's status and that the family wanted to discontinue the life support systems. Pirolli advised her that a court order would be required because the hospital had never before received such a request. She advised the nursing supervisor at about midnight that a court order was required.
Pirolli testified that Licorice called him late on the night of April 26, 1980. He was informed that Jeffrey was on life support systems and that the family had requested that they be discontinued. He was told that Jeffrey was found to be clinically brain dead. He was asked what procedure should be followed. He assumed that although physicians had found Jeffrey to be brain dead, no physician was willing to pronounce death and sign a death certificate. After consulting with the hospital's legal adviser, Edward Sullivan, he advised Licorice that a court order was required. Even though the hospital has a procedure for convening a Prognosis Committee upon a physician's request, to assist such physician who for medical or ethical reasons may be reluctant or unwilling to pronounce death and sign a death certificate in the case of a brain dead patient, Pirolli did not convene a Prognosis Committee in this *307 case because the request to discontinue the life support systems came from the parents rather than a physician. He took the position that the decision as to whether and when to remove life support systems is a medical decision which only physicians can make and that the hospital could not tell physicians how to practice their profession. He did not think that a release or consent form was necessary or required. The form used when organs are donated contains a consent to donate organs and not a consent to remove the life support systems. He testified that he spoke with Sullivan again on Monday, April 28, who advised him that with a proper release signed by plaintiffs, the life support systems could be turned off by Dr. Weinstein, another associate of Dr. Cohen.
Edward Sullivan, general counsel for defendant-hospital, testified that he advised the hospital administrator and the nurses that the decision to turn off the life support systems should be made only by a physician because that was a medical decision which only a physician could make. The hospital administrator called him late on the evening or night of April 26, 1980 and advised him that Jeffrey was clinically brain dead and asked whether the life support systems could be turned off as requested by the family. Sullivan insisted that the hospital "run EEG's until we have a clear understanding of what the boy's condition is and on Monday discuss further what to do and if necessary call the Prognosis Committee together." An EEG which had been requested on April 25 had not been done by the night of April 26. Sullivan advised that a court order be obtained if the family's wish that the life support systems be removed was to be followed before two EEG's were performed 24 hours apart to confirm irreversible brain death. The need for a court order was suggested as an alternative to a medical decision to turn off the life support systems. Sullivan felt that two EEG's would be required by either a court or a Prognosis Committee. He therefore directed the medical director to run two EEG's 24 hours apart to confirm brain death. These were performed on April 27 and April 28 and they confirmed the *308 clinical diagnosis of brain death. The court order became unnecessary when Dr. Weinstein agreed to remove Jeffrey from life support systems and sign the death certificate on April 28, 1980, if a release was signed by plaintiffs.
The hospital records disclose that on April 28, at 9:40 a.m., Dr. Weinstein examined Jeffrey and found no evidence of brain function. He, too, agreed that Jeffrey was brain dead. This was confirmed by the EEG's taken on April 27 and 28. At 2:00 p.m. the same day, Dr. Weinstein noted in the hospital chart, "patient officially brain dead and by hospital regulations we may discontinue respirator c [with] family's permission." At 2:30 p.m. the plaintiffs were asked to come to the hospital. Upon their arrival, they were told that the respirator would be turned off after they signed a release. Plaintiffs signed a release prepared by Sullivan at the request of Dr. Weinstein. The release stated:
We have been advised by the attending physicians of our son, Jeffrey Strachan, that he has been declared "brain death." It is therefore requested that all life support  life-support-death devices be discontinued as soon as possible.
In making this request we are fully aware of our legal responsibilities and further hold harmless John F. Kennedy Memorial Hospital and the attending physicians with regard to discontinuance of life support devices.
At 4:05 p.m., the life support systems were disconnected by Dr. Weinstein. At that time Jeffrey had no spontaneous respiration. Dr. Santoro made the pronouncement of death and executed a death certificate. Shortly thereafter, plaintiffs were advised that Jeffrey had been pronounced dead and that the body could be claimed for burial. The body was claimed almost immediately.
Plaintiffs testified that the delay between Saturday and Monday regarding the turning off of life support systems caused them additional emotional distress. They had seen their son on the respirator for this additional time. They, however, received no medical treatment for their emotional stress.
Plaintiffs called Dr. Jerene Robbins as their expert witness. Dr. Robbins, a certified thoracic surgeon, was licensed to practice *309 medicine in 1949. Significantly, she has never been the hospital administrator of an acute care hospital. At the time of her court appearance, she was the administrator of B.S. Pollack Hospital in Jersey City, which is a geriatric long term care facility/nursing home. Dr. Robbins has worked in an acute care hospital as a physician. At trial she gave her opinion regarding the proper procedure to be followed in cases in which a patient is declared to be brain dead. She stated that hospital personnel should first obtain releases signed by the family for removal of any life support systems. Then once a physician declares a patient to be brain dead, a progress note should be written and the physician should certify the death. The hospital staff should then remove the intravenous tubings, the respirator and other intubation; the machines should be shut off; and the body should be wrapped in a shroud and taken to the morgue.
According to Dr. Robbins, it is the responsibility of the hospital administrator to have forms available in advance at an acute care hospital for any kind of permission whether it involves a surgical procedure or bloodless invasion of the body. She stated that an acute care hospital which solicits or permits solicitation for donation of organs, should have forms available to cover all aspects of a donation program. Dr. Robbins also testified that there was no need for a court order. She opined that the failure to turn off the life support systems for more than two days after such request was made had had a destructive, agonizing effect on the plaintiffs. Finally, Dr. Robbins agreed that the hospital administrator should not make medical decisions. It was her opinion that the decision whether to remove a patient from life support systems was not a medical decision but rather, an agreement between the doctor and the family. She agreed that the hospital should not become involved in the decision whether the life support systems should be removed, but stated that the hospital should supply the necessary forms to record and effectuate the agreements *310 reached between the doctor and the family or doctor and the patient.
Dr. Cohen was called as a witness by defendants. He was the only physician to testify who had diagnosed brain death. He testified that had both parents stated to him on April 25, 1980, that they would not donate Jeffrey's organs, he "would have signed the death certificate and pulled the life support systems because I personally do not believe that there is any point to using life support systems under the circumstances in the face of brain death unless there is a donation that's being considered." Dr. Cohen also stated that although he thought he had the right to remove Jeffrey from life support systems under the circumstances, he was not obligated to do so. He testified that, "I have a right to have my own moral feelings as does Dr. Weinstein and Dr. Venkat, or any person as to whether they are willing to "pull the plug." He indicated that the decision on whether to "pull the plug" is a medical, legal and moral decision which does not require approval by a hospital administration or administrator. He said that he did not regard consent from the next of kin as a legal necessity before "pulling the plug," but stated that "it would be morally right and proper to give the parents the right to say yes or no in writing." Dr. Cohen stated that he does not ask hospitals for any forms for removal of life support systems because
the hospital administration and the hospital administrators are not physicians and have no right whatsoever to become involved in a medical matter like that. He is a business administration major. He does not have an M.D. or D.O.; has never seen the inside of a medical school. This is an issue between the next of kin and me. It's a medical matter; it's not a business matter. Life and death isn't business, it's medicine.
The case was submitted to the jury with special interrogatories, which asked:
1. (a) "Did defendant, Augustine R. Pirolli, have a duty to have procedures in place for the removal of Jeffrey Strachan from the life support systems when requested by his parents, and willfully and wantonly fail to do so, as alleged by the plaintiffs?" The answer was no.
*311 2. (a) "Did the defendant, Augustine R. Pirolli, have a duty to have procedures in place for the removal of Jeffrey Strachan from the life support systems when requested by his parents, and negligently failed to do so, as alleged by the plaintiffs?" The answer was yes.
2. (b) "Was this failure a proximate cause of the infliction of additional severe emotional stress upon the plaintiffs?" The answer was yes.
3. (a) "Did the defendant, Augustine R. Pirolli, willfully and wantonly hold the body of Jeffrey Strachan so as to prevent his proper burial?" The answer was no.
4. (a) "Did the defendant Augustine R. Pirolli, negligently hold the body of Jeffrey Strachan so as to prevent his proper burial?" The answer was yes.
The jury awarded each plaintiff $35,000 for each of the two causes of action for a total sum of $140,000.

II

WITHHOLDING A DEAD BODY
First, we focus on defendants' argument that the counts of the complaint that alleged wrongful withholding of a dead body should have been dismissed as matter of law. In order to answer this contention, we must decide whether there was a dead body before the life support systems were disconnected. The theory of an alleged wrongful withholding of a dead body is based upon an unjustified interference with a quasi property right. The early common law refused to recognize a concept of property rights in the body of a deceased person. Petition of Sheffield Farms Co., 22 N.J. 548, 555 (1956). Now the prevailing view in New Jersey is "that the right to bury the dead and preserve the remains is a quasi right in property, the infringement of which may be redressed by an action in damages." Spiegel v. Evergreen Cemetery Co., 117 N.J.L. 90, 93 (Sup.Ct. 1936). This quasi right in property of the family to bury the *312 dead and intern the remains has been discussed more recently in Muniz v. United Hsps. Med. Ctr. Pres. Hsp., 153 N.J. Super. 79, 82 (App.Div. 1977). See also 4 Restatement, Torts 2d, § 868 at 274 (1977).
The profound moral conundrum which engulfs this case was eloquently articulated in Matter of Conroy, 98 N.J. 321, 343 (1985):
As scientific advances make it possible for us to live longer than ever before, even when most of our physical and mental capacities have been irrevocably lost, patients and their families are increasingly asserting a right to die a natural death without undue dependence on medical technology or unnecessarily protracted agony  in short, a right to `die with dignity.' On the other hand, all persons have a fundamental right to expect that their lives will not be foreshortened against their will. The President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, an interdisciplinary group of ethicists, lawyers, doctors, theologians, and others established by Congress in 1978 to propose guidelines for resolving these and similar issues, stated the problem this way: `Once someone realizes that the time and manner of death are substantially under the control of medical science, he or she wants to be protected against decisions that make death too easy and quick as well as from those that make it too agonizing and prolonged.' President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment 23 (1983) [hereinafter cited as President's Commission Report].
Before the case was submitted to the jury, defense counsel urged the judge to dismiss the cause of action for withholding or mishandling Jeffrey's dead body because Jeffrey was not dead inasmuch as his heart was still beating and he continued breathing until the life support systems were disconnected. The traditional understanding of death has been that it is manifested by irreversible cessation of spontaneous cardiopulmonary functions. See In re Quinlan, 70 N.J. 10, 27 (1976). But "[t]he ever more sophisticated capabilities developed by biomedical practitioners during the past quarter century to support or supplant certain vital functions [such as cardiopulmonary] have created problems in diagnosing death." President's Commission Report, Defining Death at 21 (1981). A person may be artificially supported for respiration and circulation after all brain functions have ceased irreversibly. In re *313 Quinlan, supra, 70 N.J. at 27. Consequently, the traditional definition of death may no longer be desirable or workable.
The Uniform Determination of Death Act, approved by the National Conference of Commissioners on Uniform State Laws in 1980, which was recommended by the President's Commission Report, has been adopted by at least 14 states, but New Jersey is not one of them. Section 1 (page 271) of that Act provides: "An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards." The New Jersey State Senate has proposed to adopt the Act. See Senate Bill 1050, introduced on January 23, 1984. This bill died on the last day of the Legislative session. On November 12, 1985, Governor Kean signed into law Assembly Bill 3316 which created the "New Jersey Commission on Legal and Ethical Problems in the Delivery of Health Care" to provide a comprehensive examination of the impact of advancing technology on health care decisions including termination of life support systems. L. 1985, c. 363.
In In re Quinlan, supra, 70 N.J. at 27 although the patient was not brain dead, our Supreme Court seemingly approved the standards delineated by the Ad Hoc Committee of the Harvard Medical School in 1968 for a declaration of death and removal of a respirator. Those standards generally provide that a patient who is clinically brain dead and has flat or isoelectric EEG's repeated 24 hours apart unless massive brain damage is visualized, may be declared dead only by a physician. "Death is to be declared and then the respirator turned off. The decision to do this and the responsibility for it are to be taken by the physician in-charge, in consultation with one or more physicians who have been directly involved in the case...." In re Quinlan, supra, 70 N.J. at 28.
*314 The facts are undisputed in the present case that no attending or examining physician declared death, made such an entry onto the hospital chart or signed a certificate of death prior to the afternoon of April 28 when the life support systems were disconnected. We are therefore persuaded that the quasi right in property of the next of kin to claim a dead body for burial did not vest until the pronouncement of death was made by Dr. Santoro at approximately 4:10 p.m. on April 28, 1980, at which time the death certificate was executed in accordance with N.J.S.A. 26:6-7. Before the life support systems were disconnected, there was no dead body to be claimed for burial within the meaning of Spiegel. See also 4 Restatement, Torts 2d, § 868 at 274 (1977). Not until then was there a dead body ready for burial or disposition by a funeral director even though death could have been declared before the respirator was turned off. See Matter of Conroy, supra, 98 N.J. at 356-357, n. 3. The plaintiffs were notified almost immediately after the pronouncement of death that they could claim the body. They did in fact claim the body then. In these circumstances, there was no actionable wrongdoing associated with withholding or mishandling the dead body.[1]

III

NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ON BYSTANDERS

A. WAS THERE A DUTY OWED BY DEFENDANTS?
Defendants contend that the alleged negligent infliction of emotional distress should have been dismissed because there was no duty to have a procedure for turning off the life support *315 systems or to have consent forms available. Defendants argue that the family's written consent was unnecessary and that the decision to withdraw the life support systems was a medical decision. Plaintiffs have not contended that defendants breached any duty owed to Jeffrey by placing him on the life support systems or that the treatment administered caused Jeffrey any harm. Nor have plaintiffs contended that defendants acted improperly by participating in the request for donation of organs. Similarly, plaintiffs have not contended that the appearance of Jeffrey on the life support systems after their request to disconnect the respirator was any different than before the request was made. In other words, Jeffrey looked the same before and after the request. The basis for the award of $140,000 is the alleged increased emotional distress inflicted by defendants for not having procedures in place to disconnect the respirator and for not having consent forms available.
In connection with plaintiffs' claim that the hospital and its administrator had a duty to have consent forms available or to have other procedures in place for turning off life support systems upon their request, we observe that plaintiffs have not sought to hold the hospital vicariously liable for the possible negligence of any of the doctors. Vicarious liability was alleged only with respect to the hospital and hospital administrator. Therefore, any possible breach of duty on the part of any attending physician in not turning off the life support systems upon the request of plaintiffs cannot be imputed to the defendants. Moreover, we are not called upon to decide whether any doctor was negligent.
"Before recovery may be had, a duty must exist in law and a failure in that duty must be proved as a fact." Mergel v. Colgate-Palmolive-Peet Co., 41 N.J. Super. 372, 379 (App.Div.), certif. den. 22 N.J. 453 (1956). Whether a duty exists is a matter of law to be decided by the Court, not the jury. Essex v. New Jersey Bell Telephone Co., 166 N.J. Super. 124, 127 (App. Div. 1979); McKinley v. Slenderella Systems of Camden, N.J., *316 Inc., 63 N.J. Super. 571, 581 (App.Div. 1960); McIntosh v. Milano, 168 N.J. Super. 466, 495 (Law Div. 1979). "A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition in effect, to conform to a particular standard of conduct toward another." Prosser and Keeton, The Law of Torts (5th ed. 1984), ¶ 53 at 356. See also 2 Harper and James, The Law of Torts, ¶ 18.1 at 1015 (1956) and 1 Restatement, Torts 2d, ¶ 4 at 7 (1965). "[N]egligence does not exist in the abstract, it contemplates a legal duty owing from one party to another...." Tappen v. Ager, 599 F.2d 376, 379 (10th Cir.1979).
Plaintiffs' expert opined that the hospital should have foreseen, as a participant in organ donation programs, that the families of some brain dead patients would not consent to organ donations and that in that event, procedures and consent forms to disconnect respirators should have been readily available. This hypothesis begs the issue. More than foreseeability is needed.
[`M]ore' being the value judgment, based on an analysis of public policy, that the actor owed the injured party a duty of reasonable care. Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 162 N.E. 99 (1928). In Goldberg v. Housing Auth. of Newark, 38 N.J. 578, 583 (1962), this Court explained that `whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.' [Kelly v. Gwinnell, 96 N.J. 538, 544 (1984)].
A court's instruction to a jury may not impose upon a defendant a duty where none exists in law. Kulas v. Public Service Elec. and Gas Co., 41 N.J. 311, 320 (1964). Actionable negligence involves a breach of duty established by law resulting in damages proximately caused by the breach of duty. Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295, 315 (1954). The standard of conduct required to satisfy a legal duty becomes relevant only after a duty is established. Infliction of emotional distress is not a tort but rather an item of damage which must be related proximately to the breach of a duty.
*317 The principles distilled from existing law persuade us to conclude that the hospital had no duty to provide consent forms or to have a procedure for turning off the respirator. The hospital administrator is not a physician. He is a business person. A hospital administrator has no right to tell a physician how to practice medicine. In Quinlan, where the patient was comatose, and Conroy, where the patient was terminally ill, special procedures were required to minimize the risk of a premature withdrawal of life support systems with irremediable consequences. Here, there was only a remote chance that a brain dead patient's life would be ended too soon. It seems to us to be fundamental that the decision whether to withdraw the life support systems from a brain dead patient is a medical decision which can be made only by a physician. Plaintiffs' expert, and Dr. Cohen agreed on this point. They also agreed that it is the responsibility of the attending physician to pronounce death and sign a death certificate. The law does not impose upon a hospital administrator a duty to establish a procedure to tell physicians how to practice medicine. Nor does the law require the hospital administrator to make available to physicians, forms for execution by the next of kin consenting to the pronouncement of death. As earlier noted, a Prognosis Committee[2] meeting would be convened by the hospital administrator only upon the request of a physician who needs help in deciding whether to disconnect a respirator. The record before us does not reveal that such a request was ever made.
Similarly, the relationship that existed between the hospital and Jeffrey does not require imposition of a duty upon the hospital to provide a procedure or consent forms to disconnect the life support systems. It is an undisputed fact that the hospital provided high quality medical care to Jeffrey and that the failure to have procedures in place or a consent form *318 available in no manner worsened Jeffrey's injuries or discomfort, or diminished his dignity. On the other hand, plaintiffs understandably admit that at least for sometime, they were hoping for a miraculous improvement in Jeffrey's condition.
Additionally, we discern no defined public policy which imposes a duty on the hospital or its administrator to have procedures and consent forms available for the withdrawal of life support systems. The public policy of this State identified in the "right to die" cases, see In re Quinlan, supra, and Matter of Conroy, supra, will undoubtedly be defined by the Commission which was recently created by L. 1985, c. 363. The public policy which we glean from reading these cases is (1) to prevent premature termination of life, (2) to accommodate a person's right to die with dignity, and (3) to insulate health care providers from civil and criminal liability for "pulling the plug." The imposition of a duty in the circumstances would not further the public interest because it would create new liability for hospitals which would have ramifying consequences like the ripplings of the waters at a time when some commentators have observed that we are in the midst of a medical malpractice crisis. Also, in the performance of the weighing function, it is significant to us that the hospital acted reasonably by requiring a court order in a case of first impression. Never before had it received a request to terminate life. In the Quinlan case, the court proceedings were pending for approximately eight months and the court proceedings in the Conroy case were pending for approximately two years. If the court order had been pursued, it would have taken substantially longer than the sixty hours between the time of the request to terminate life and the time the respirator was disconnected. Public policy favors settlement of both pending and potential litigation; Pascarella v. Bruck, 190 N.J. Super. 118, 125 (App.Div.), certif. den. 94 N.J. 600 (1983); as well as preservation of life.
Fairness is also an important element to consider when deciding whether a duty exists. "Fairness ordinarily requires *319 that a man [or a hospital] be able to ascertain in advance of a jury's verdict whether the duty is his and whether he has performed it." Goldberg v. Housing Auth. of Newark, supra, 38 N.J. at 589. No court in this State or any other jurisdiction has imposed liability in the present circumstances.[3] As we observed earlier, the problem finds its roots in the sophisticated capabilities developed by biomedical practitioners. The New Jersey Commission to be established pursuant to L. 1985, c. 363 will also be studying a broad range of problems related to the right to die and will make recommendations for new legislation. It is our considered opinion that the facts of this case do not warrant establishment of a duty pending the Commission study of the problems. Moreover, the Harvard Ad Hoc Committee's recommendation which was approved sub-nominally in In re Quinlan, supra, made it clear that the decision to turn off the respirator is a medical one and that the attending physician must take full responsibility. It would indeed be unfair to permit attending physicians to transfer that nondelegable responsibility by asking the hospital administrator to outline the procedure to be followed.
We previously indicated that during the trial and appeal, plaintiffs have contended that because defendants provided consent forms to disconnect the life support systems for organ donation, defendants similarly had the duty to provide consent forms in cases in which the next of kin refused such donation. This argument is clearly erroneous for several reasons.
*320 First, the need for consent to donate organs is required by the Uniform Anatomical Gift Act, N.J.S.A. 26:6-59. Without the consent, Jeffrey's organs could not legally be obtained for donation. Thus, the statutory law of this State imposes a duty upon the hospital to obtain consent before removing organs for donation or otherwise the hospital will expose itself to civil liability. N.J.S.A. 26:6-63(c).
Second, the available consent form for donation of organs did not contain a consent for removal of the respirator. Consequently, the organ donation consent form was not germane to the alleged need for a consent form to terminate the respirator.
And third, the existence of a duty "is not solved merely by recourse to foreseeability." Goldberg v. Housing Auth. of Newark, supra, 38 N.J. at 583. It may have been reasonably foreseeable that physicians would want to have next of kin sign a consent form before disconnecting life support systems in order to protect themselves from malpractice suits; however, that does not create a corresponding duty on the hospital to make such forms available. We recognize that the practice of defensive medicine has become a way of professional life for many physicians, but we are unwilling to go so far as to say that the hospital administrator had a duty to, in essence, become the legal adviser or defender of attending physicians practicing at defendant-hospital. There is no court in the country that has imposed such a duty. We choose not to be the first.
Finally, plaintiffs contend that the hospital's obligation to obtain informed consent before treating a patient also required it to have consent forms available for terminating the life support systems. A physician who proposes to perform a medical or surgical procedure is under an obligation to explain the procedure to the patient and to disclose the dangers incident to it, so the patient may make an intelligent and informed choice as to whether to consent. See Perna v. Pirozzi, 92 N.J. 446, 459-460 (1983); Annot., 79 A.L.R.2d 1028 (1961); and, 61 *321 Am.Jur.2d Physicians, Surgeons and Other Healers ¶ 187 (1981). Failure to obtain consent to treat a patient may expose a physician to civil liability for a battery. Perna v. Pirozzi, supra, 92 N.J. at 460-461; Skripek v. Bergamo, 200 N.J. Super. 620, 633 (App.Div. 1985). But plaintiffs' argument overlooks the clear distinction between consenting to receive treatment and consenting to terminate life. We are not aware of any requirement that a patient or relative must consent to termination of treatment when the attending physician concludes that further treatment is useless or unnecessary. We therefore find this argument to be unpersuasive.

B. CAN PLAINTIFFS RECOVER UNDER THE PORTEE DOCTRINE?
Defendants further argue that even if there was a duty which was breached, plaintiffs' emotional distress damages are barred by Portee v. Jaffee, 84 N.J. 88 (1980). Under Portee and other cases, the instant plaintiffs would be designated as bystanders because they were not the recipients of the treatment administered by the hospital. Portee has outlined the guidelines which must be followed when determining whether emotional distress damages are recoverable by bystanders. There, our Supreme Court observed:
The cause of action we approve today for the negligent infliction of emotional distress requires proof of the following elements: (1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress. [84 N.J. at 101]
It is clear from the record that plaintiffs have been able to establish only two of the four elements required by Portee: the existence of an intimate familial relationship and evidence of severe emotional distress. They did not establish that the hospital caused Jeffrey's death or any serious physical injury. The hospital record shows that Jeffrey's condition after plaintiffs requested that the respirator be turned off on Saturday morning remained about the same as it had been since he *322 had been placed on the respirator on Friday evening. Since no injury or death was caused by the hospital, there was none to be observed by plaintiffs. The purpose of the guidelines is to guard against unwarranted extensions of liability for emotional distress suffered by bystanders. Under the guidelines, forseeability became fused with the concept of duty as a vehicle for limiting liability on the basis of policy considerations. There are times when social policy must intervene to delimit liability. Not every emotional distress can be made compensable by money damages. Courts must locate the line between liability and nonliability at some point.
While we recognize that plaintiffs' emotional distress, grief, anxiety, mortification, shock and embarrassment were not made easier by the attending physicians' refusal to turn off the life support systems upon their request, we are only an intermediate appellate court and we are, therefore, not free to take an expansive view of Portee guidelines. See Brehm v. Pine Acres Nursing Home, 190 N.J. Super. 103, 110 (App.Div. 1983); Eyrich For Eyrich v. Dam, 193 N.J. Super. 244, 259 (App.Div.), certif. den. 97 N.J. 583 (1984); Lindenmuth v. Alperin, 197 N.J. Super. 385, 389 (Law Div. 1984); Henderson v. Morristown Memorial Hosp., 198 N.J. Super. 418, 430-431 (App.Div. 1985). Plaintiffs' reliance on Hume v. Bayer, 178 N.J. Super. 310 (Law Div. 1981) as an expansion of Portee which should be followed in the present case is misplaced. Hume, supra, involved the tort of outrage which requires intentional or reckless conduct. In the present case, plaintiffs' verdicts are based upon principles of ordinary negligence; the jury rejected plaintiffs' claim of wilful and wanton misconduct. The emotional distress damages herein are well beyond the outer limit fixed in Portee and must therefore be vacated.
*323 For the foregoing reasons, the judgment for plaintiffs in the sum of $140,000 is reversed.[4] The matter is remanded to the Law Division, Camden County, for the entry of judgment for the defendants.
LONG, J.A.D., (dissenting).
My determination to dissent is based upon my conviction that this is not a "right to die" case but an ordinary tort action instituted by plaintiffs whose claims for relief do not fall within the rationale of Portee v. Jaffee and whose recovery cannot be barred thereby.
The facts, as set forth in the majority opinion, require elucidation. At 4:30 p.m. on April 25, 1980, 20 year old Jeffrey Strachan, the only child of his parents, put a bullet through his head. He lived briefly, exhibiting spontaneous respiration in the Emergency Room of John F. Kennedy Memorial Hospital. Within the hour, his spontaneous respiration ceased, his pupils became dilated and no reflexes were detected. As a result, he was placed on a respirator and the Emergency Room physician, Dr. Hummel, advised his parents, Gordon and Marilyn Strachan that Jeffrey was "brain dead" and asked them to consider donating his organs for transplant.
At 8:10 that evening, less than four hours after Jeffrey inflicted his wound, Dr. Robert Cohen, a neurologist, examined him again and confirmed to the Strachans that Jeffrey was "brain dead," that his brain function could not be restored, that his heart was pumping only through the efforts of the respirator and reiterated the request that the Strachans consider donating his organs. In the chart, Dr. Cohen wrote:
... this patient is brain dead. At present we are working with parents trying to obtain permission to harvest kidneys and corneas and possibly heart. Our staff is working with transplant team personnel in this effort. If they get permission to harvest, proceed. [Emphasis added].
*324 At trial, where he was produced by the defense as a witness, Dr. Cohen was asked by defense counsel, "what's the difference between brain dead and dead?" He replied:
Alright, you're into I think a technicality. Dead dead I suppose you would say is when someones heart stops and in that case there is simply nothing further to talk about. A person, however, does not reside in their heart as we all know. Medicine's reach into the capability now of even being able to replace hearts and kidneys, livers and even lungs. A person is their brain. So, I did an accepted neurologic examination which showed in essence no function in his brain stem whatsoever, and that by definition means that his brain was dead, even though his heart was still beating. [Emphasis added].
According to his testimony at trial, Dr. Cohen would have removed Jeffrey's body from the machines and signed a death certificate that evening but for the Strachan's expressed intention to consider organ donation overnight. Stephen Sammut of the Delaware Valley Transplant Program advised the Strachans that a decision would have to be made by 11:00 the next morning because if any more time elapsed the organs would deteriorate. According to the Strachans, both Dr. Cohen and Sammut explained that regardless of what decision they made, on the following morning Jeffrey would be removed from the respirator.
Within 12 hours the Strachans made their decision. The next morning, April 26th, Gordon Strachan returned to the hospital at 8:30 a.m. and advised the staff that he and his wife did not wish to donate their son's organs and that they wished to have the life support systems removed. Although Dr. Pinzler asked Strachan to rethink the issue of organ donation, he wrote the following note in Jeffrey's chart:
The family has decided not to permit the harvesting of any organs. Dr. Cohen is informed; the case was dismissed.
According to the uncontroverted testimony of Dr. Jerene Robbins, the Strachans' expert at trial, "case dismissed" means:
... the case is terminated. It's up to the hospital now to prepare that body and send it to the morgue to be removed to the undertaker.
At dinner time, on Saturday, April 26, Strachan returned to the hospital and confirmed his decision not to donate Jeffrey's organs. This is the critical point in the case. From this *325 moment until late on Monday, April 28th, Jeffrey Strachan remained on life support for one reason and one reason only, because no one at the hospital knew the procedure to remove him.
That this is a fact is amply supported by the record. When Gordon Strachan returned to the hospital on Saturday at dinner time, he spoke to a Dr. Venkat, who reiterated that Jeffrey was "brain dead." Under those circumstances, Strachan requested the removal of the life support machinery so that Jeffrey could be buried. Venkat's note in Jeffrey's chart states:
No evidence of cerebral function; told parents of the fact and that the brain is dead clinically. They expressed in that case the ventilator may be shut off. As soon as hospital administrator tells us the procedure we will do so. [Emphasis added].
The rather clear implication is that if Venkat had known the hospital protocol for removing Jeffrey from life support, he would have used it, and this case would not have occurred.
Venkat's lack of knowledge of the hospital procedure was not isolated. On the same evening different nursing staff members variously indicated to Strachan that they had no idea what hospital protocol was involved, that only the hospital administrator, August Pirolli, could authorize life support removal, and that they were attempting to contact Pirolli to obtain "proper papers" for removal of Jeffrey from life support machinery. Thereafter, the assistant administrator of the hospital, Ms. Licorice, was called by the nursing supervisor, requesting advice from the hospital administrator as to the procedures necessary to turn off the machines. Licorice, however, had no idea what rules applied where organ donation was not involved. Accordingly, she in turn called Pirolli at a wedding he was attending. Although he denied having done so during discovery, Pirolli admitted at trial that his response to Licorice was to telephone the hospital's lawyer, Sullivan. Their conversation resulted in a return call from Pirolli to Licorice advising that a court order would be needed to remove Jeffrey from life support because the hospital had never received such a request. *326 Pirolli testified that he "assumed" that no doctor was willing to pronounce death or sign a death certificate. Given the history of this matter and Venkat's request, this assumption appears to have come out of thin air.
At trial, Pirolli admitted that there was no disseminated policy or protocol for the removal of a brain dead patient from life support, but explained that the removal of life support is a medical decision in which the hospital administration has no part. Pirolli was unequivocal on this point as well as on the point that, given the medical nature of the decision, a release from the family is not required for removal of life support. On cross-examination however, Pirolli acknowledged having testified in a very different way during depositions where he stated that with a release, "we can authorize the discontinuance of life support systems" [emphasis added]; that with the "proper release" the hospital could discontinue life support merely upon the parent's request; and that once a patient was on life support and a consent to remove him was obtained there was, in essence, no need for further medical inquiry because "life support systems is an indication that ... the patient would not be able to survive. So there that was sufficient from administrative stand point to make that type of determination" [emphasis added]. Pirolli also testified about an "unwritten procedure" for invoking a prognosis committee to assist a physician in making a determination as to death which, in his opinion, was unnecessary in this case because the parents were requesting removal and not a physician.
After speaking with Pirolli, Licorice instructed the nursing supervisor as to the need for a court order. The dissemination of this information to staff effectively froze the status of the matter since it is doubtful that any physician would have considered terminating life support in the face of Pirolli's directive that court intervention was needed. At 2:00 a.m. Sunday morning the Strachans were advised of the need for a court order. From then on they made efforts through friends, *327 police, the prosecutor, legal aid and eventually a private attorney to obtain some relief.
On Monday, April 28, while at the attorney's office, the Strachans were advised that the hospital administrator wished to see them. At the hospital, Pirolli presented them with a release which they signed. Notwithstanding this, at trial Pirolli testified that he did not think a release or consent was needed in Jeffrey's case. He said he obtained a release from the Strachans because on Monday, April 28, the hospital's lawyer told him the life support systems could be turned off if a release were signed. The lawyer, Sullivan, testified that he didn't think a release was necessary either but that he prepared one "because Dr. Weinstein would not act without it." Dr. Weinstein's notes on the chart indicate his understanding on the subject: "... by hospital regulations we may discontinue respirator [with] family's permission." [emphasis added]. What this underscores is the fact that neither Pirolli nor Sullivan had a clear idea of what rules governed the issue of a release in a life support removal case and that Weinstein, like Venkat and the nursing staff members believed not only that there was an administrative protocol on the subject but that he was required to abide by it, indicating that the source of authority for terminating life support was administrative, not medical. Pirolli's acquiescence in Sullivan's advice that a court order was needed only serves to highlight the fact that no one connected with the hospital either administratively, medically or legally knew with certainty the procedure for the termination of life support in a brain dead patient. At 4:05 p.m. on Monday, April 28, without a court order, Dr. Weinstein removed Jeffrey from the respirator and Dr. Santoro pronounced him dead.
While the majority concedes that these circumstances caused Mr. and Mrs. Strachan to suffer severe emotional distress, it holds that our law provides them no redress. I disagree. Indeed, except insofar as the majority characterizes this case as "tragic" there is no consensus between us. I differ with the majority from its point of departure  that this is a "right to *328 die" case  through to its conclusion  that our law will not allow the Strachans to recover. In my estimation, as the calculation of an angle determines the resulting triangle, the skewed beginning point adopted by the majority compelled a skewed result.
More to the point, it is inconceivable to me that this could be viewed as a "right to die" case. The moral issues implicated in a "right to die" case can only exist where there is a choice between life and death, as the decisions in In re Quinlan, 70 N.J. 10 (1976), cert. den. 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976) and Matter of Conroy, 98 N.J. 321 (1985) poignantly demonstrate. Unlike Jeffrey Strachan, it was conceded that neither Karen Ann Quinlan nor Claire Conroy was "brain dead" when the issues surrounding them arose. Quinlan was in a chronic vegetative state but with some brain stem function. 70 N.J. at 25. Conroy suffered from organic brain syndrome with concomitant confusion and physical problems requiring tube feeding. 98 N.J. at 336. Obviously, the cessation of life support systems in Quinlan's case and starvation by removal of the nasogastric tube from Conroy were clear "right to die" issues with moral implications. However, as this record amply demonstrates, from its inception there was never a suggestion by any medical expert that Jeffrey was not brain dead or that he exhibited any signs normally identified with life. Nor did any physician decline for medical reasons to remove the respirator. No moral implications whatsoever were involved in the hospital's failure to remove Jeffrey from life support. The only reason Jeffrey was not removed was because no one knew the proper procedure. Thus, it is entirely inaccurate and unfair to suggest that the issue in this case is whether Jeffrey Strachan had a "right to die."
I believe the majority is misguided in its suggestion, apparently footed in a superficial reading of the jury questions, that the Strachans claims are based upon the negligence of the hospital in not removing Jeffrey from life support merely upon their request. The implication of such a formulation is that it *329 was the Strachans who decided that Jeffrey was dead and that there was no longer a point in keeping him on life support. That would be an entirely different case than this one. Here, Jeffrey's physicians told the Strachans unequivocally that his brain was irreversibly dead as was his respiratory system which was functioning only because of a machine. It was in response to this information and only in response to it that the Strachans asked that their son, who was "dead enough" to donate his vital organs to others, be released to them for burial. As Mrs. Strachan testified at trial: "I couldn't understand why they wouldn't turn it off because they told me that he was dead."
At the heart of this case is one thing only  the failure of the hospital to have in effect a disseminated policy available to staff for removal of life support from a concededly brain dead patient. This is not a moral issue, let alone a profound one. It is a question of tort law, no more and no less.

Withholding a Dead Body
The majority's sole basis for reversing the jury verdict as to wrongful disposition of a dead body is that "prior to April 28 when life support was removed there was no dead body to be claimed for burial." It is ironic that, in a case in which the aggrieved parties are alleging the negligent failure to remove their dead son's body from life support systems, this court could credit such a defense.
Four doctors testified either expressly or by implication that Jeffrey Strachan was dead on Friday night. Not a single medical witness was produced by the hospital to testify to the contrary. Dr. Cohen stated that Jeffrey was dead and that he would have removed him from life support with no further ado on Friday night but for the pendency of the transplant decision. Dr. Pinzler said the case was "dismissed," a term that Dr. Robbins defined as meaning the body should be sent to the morgue and prepared for the undertaker. Dr. Venkat would *330 have removed the life support systems on Saturday "as soon as hospital administrator tells us the procedure." On Monday, Dr. Weinstein concurred with Dr. Cohen's Friday night determination.
The only suggestion to the contrary came from the administrator of the hospital who, while gainsaying any medical expertise, nevertheless insisted, completely contrary to the hospital records under his administrative charge, that no doctor "said" that Jeffrey was dead. His position, in the face of this record, was soundly rejected by the jury as it should be by us. The hospital records and the testimony reflect that Jeffrey's organs would have been harvested on Friday night if the Strachans had agreed. "You can't be dead enough," Pirolli exhorted. Dead enough for what? Jeffrey Strachan was dead enough for me.
He was also dead by common medical and legal standards. According to the majority, "the traditional understanding of death has been that it is manifested by irreversible cessation of spontaneous cardiopulmonary functions." It is undisputed that that is what occurred here. By 5:25 p.m. on Friday evening Jeffrey Strachan had ceased all spontaneous cardiorespiratory functions. Because those functions can be reproduced by cardiorespiratory machinery, the medical and legal communities have come to recognize that the cessation of cognitive ability is the standard by which death can be established. Indeed, although Quinlan and Conroy clearly did not involve brain death, both recognized brain death as actual death. Quinlan, citing the Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death, "A Definition of Irreversible Coma," 205 J.A.M.A. 337, 338 (1968) stated that when the criteria for "brain death" are met, "death is to be declared and then the respirator turned off." 70 N.J. at 28. Likewise Conroy identified whole brain death as defined by the Harvard Ad Hoc Committee or other reliable medical criteria as equivalent to actual death. 98 N.J. at 356 n. 3.
*331 These holdings are in keeping with the trend in this and other jurisdictions in criminal cases where brain death has been judicially recognized as death in fact. E.g., State v. Watson, 191 N.J. Super. 464 (App.Div. 1983), certif. den. 95 N.J. 230 (1983); State v. Meints, 212 Neb. 410, 322 N.W.2d 809 (Sup.Ct. 1982); Swafford v. State, 421 N.E.2d 596 (Ind.Sup.Ct. 1981); State v. Fierro, 124 Ariz. 182, 603 P.2d 74 (Sup.Ct. 1979); Commonwealth v. Galston, 373 Mass. 249, 366 N.E.2d 744 (Sup.Ct. 1977), cert. den. 434 U.S. 1039, 98 S.Ct. 777, 54 L.Ed.2d 788 (1978); State v. Johnson, 60 Ohio App.2d 45, 395 N.E.2d 368 (Ct.App. 1977), aff'd 56 Ohio St.2d 35, 381 N.E.2d 637 (Sup.Ct. 1978). In light of Quinlan and Conroy, there is no reason why this standard is not equally applicable on the civil side.
The American Bar Association rule defines death "[f]or all legal purposes [as] a human body with irreversible cessation of total brain functions, according to usual and customary standards of medical practice." 61 A.B.A.J. 464 (1975) quoted in Black, Brain Death, Part II, 299 N.Eng.J. of Med. 393, 398 (1978). Further, New Jersey has, along with 47 other states adopted the Uniform Anatomical Gift Act (N.J.S.A. 26:6-57 et seq.), the comments to which indicate that brain death as determined by a physician is an acceptable means of ascertaining death. See generally Comment, 29 Rutgers L.Rev. 485, 490 and 490 n. 31 (1976). Pending, but not yet adopted in New Jersey, is the Uniform Determination of Death Act which would codify what Quinlan, Conroy and Watson have already judicially established in individual cases: that brain death is equivalent to actual death.
The majority's oblique reference to the need for two flat EEG's for the declaration of death requires comment. Although it is true that the original and widely quoted criteria established in 1968 by the Harvard Ad Hoc Committee for the determination of brain death generally included two flat EEG's repeated at least 24 hours apart, by 1980 this requirement had been transmuted into a confirmatory but not necessary technique, *332 especially when the cause of the injury was not drug related. Black, supra; Sweet, Brain Death, 299 N.Eng.J. of Med. 410 (1978); Hirsch & Donovan, "The Right to Die: Medico-Legal Implications of In Re Quinlan" 30 Rutgers L.Rev. 267, 291-295 (1977). Indeed in 1980, while JFK Hospital had no protocol for removing a brain dead person from life support, it did have a protocol for declaring "brain death", which stated in accordance with present-day thinking that "an isoelectric E.E.G. is of confirmatory value, but is not essential for the determination of brain death."
Likewise the organ harvesting protocols used by the hospital in 1980 provided:
Determination of brain death; comprehensive criteria for the determination of irreversible coma (brain death) having been enumerated by the Adhoc committee of the Harvard Medical School, 3/17/68.
The complete criteria are listed on the attached check list. The social criteria re complete unresponsiveness to painful stimuli; no spontaneous movement or breathing; the patient requires a respirator; no cranial nerve reflexes; if available an EEG is considered confirmatory. If utilized the EEG should be isoelectric. [Emphasis added].
Similarly, although Pirolli indicated the necessity for two flat EEG's, on cross-examination he acknowledged the following language from the hospital's policies and procedures in effect in 1980:
EEG: an isoelectric EEG is a valuable confirmatory test, but does not replace the physician's clinical examination, a flat EEG, or a performance of an EEG, is not required for our criteria of neurological death. [Emphasis added].
In fact, the suggestion that two flat EEG's were necessary in this case was never advanced by anyone except Sullivan, the hospital's lawyer, who, apparently having read Quinlan, directed that the EEG's take place, unaware that medical standards and the hospital's own policies had advanced beyond requiring two flat EEG's before declaring brain death. Thus the Monday EEG does no more than confirm brain death, a condition clinically described on Friday night.
Further, the suggestion that Jeffrey failed to qualify as a "dead body" for wrongful disposition purposes because he was not "declared" to be so is contrary to this record. Certainly Dr. *333 Cohen believed that he had sufficiently declared Jeffrey dead since he authorized the staff to "proceed" with organ harvesting if the Strachans consented. Likewise Dr. Pinzler was satisfied with the "declaration" since he directed that Jeffrey's body be sent to the morgue. Dr. Venkat had no question as to the "death" but merely wanted to know how to remove the machines. Only Administrator Pirolli, his lawyer, and the majority here would require the assurance of a formal declaration of words in preference to the assuring of bereaved parents. Inexplicably, the majority is satisfied that Jeffrey was not dead until the certificate of death was executed at 4:10 p.m. on April 28 in accordance with N.J.S.A. 26:6-7, notwithstanding that such a certificate, which is a vital statistics measure, is not even required to be executed until 24 hours after the death. N.J.S.A. 26:6-8. It is difficult to understand how the completion of a death certificate could be considered superior to the clear determination of brain death by all the physicians concerned. In my view, against the backdrop of this record, the majority's conclusion that Jeffrey was not "a dead body" for wrongful disposition purposes is a dehumanizing triumph of form over substance.

Negligent Infliction of Emotional Distress
That the majority misconceives this issue is evidenced by its articulation of the question: "Can plaintiffs recover under the Portee [v. Jaffee, 84 N.J. 88 (1980)] doctrine?" The answer to that question is obviously no. It is also entirely irrelevant, since the Strachans did not seek Portee damages. Rather they sought and recovered damages as the direct recipients of the hospital's negligence, not as mere bystanders.
A brief outline of the rather confusing patchwork of cases addressing the subject of emotional distress as a result of negligence is helpful to understanding this distinction. Emotional distress has long been recognized as a source of recovery subject to rather rigid, formalistic requirements which evolved as a result of the traditional view of such claims as untrustworthy, *334 subject to serious proof problems and bearing the potential for unjust application. Historically, one could not recover for emotional distress resulting from negligent conduct in the absence of a contemporaneous "impact" or physical injury. See, e.g., Greenberg v. Stanley, 51 N.J. Super. 90, 106 (App.Div. 1958), mod. on other grounds 30 N.J. 485 (1959); Justesen v. Pennsylvania R.R. Co., 92 N.J.L. 257 (Sup.Ct. 1919); Tuttle v. Atlantic City R.R. Co., 66 N.J.L. 327 (E. & A. 1901); Ward v. West Jersey & S.R.R. Co., 65 N.J.L. 383 (Sup.Ct. 1900), overruled 45 N.J. 559 (1965); Consolidated Traction Co. v. Lambertson, 60 N.J.L. 457, 458 (E. & A. 1897).
With the passage of time and the decisions in a series of cases in which practically nonexistent impact was the peg upon which recovery for serious emotional disturbance was allowed, the impact rule came under nearly universal criticism. See generally Comment, 59 Geor.L.J. 1237 (1971); Molien v. Kaiser Found. Hosps., 27 Cal.3d 916, 616 P.2d 813, 167 Cal. Rptr. 831 (Sup.Ct. 1980). And see, e.g., Porter v. Delaware, Lackawanna & W.R.R. Co., 73 N.J.L. 405 (E. & A. 1901) (dust in plaintiff's eyes sufficient to meet impact requirement). The trend away from the impact rule in New Jersey began with the decision in Falzone v. Bush, 45 N.J. 559 (1965) where plaintiff suffered substantial injury from fright as a result of having been put in fear for her own safety when defendant's vehicle "negligently veered across the highway and headed in [her] direction." Id. at 561. The Falzone court eliminated the requirement of physical impact and allowed recovery for injuries resulting from mental distress. In so doing, it applied a "zone of danger" concept and held that immediate fear of personal injury would operate in that case as the necessary pre-requisite for recovery for severe mental anguish. Id. at 569.
Thereafter, in the crucial case of Caputzal v. The Lindsay Co., 48 N.J. 69 (1966), the supreme court was faced with what it termed as a "bizarre" claim for which recovery theoretically would have been allowed under Falzone. In Caputzal, plaintiff made and drank coffee without looking closely at the water *335 he used. Thereafter he turned on the faucet and observed that the water was rusty and brown as a result of some malfunction in a water softener manufactured by Lindsay. Concluding that he had been poisoned, Caputzal immediately suffered a heart attack. He sued Lindsay, which successfully defended at trial on the basis that there had been no physical impact. The Appellate Division reversed based on the newly decided Falzone case and remanded the matter for trial. In reversing the Appellate Division, the supreme court delimited Falzone by reiterating the applicability of concepts ordinarily applied in determining whether liability should flow from nonintentional conduct: whether a duty existed, whether it was breached, whether the breach proximately caused the injury complained of and whether the injury was forseeable. 48 N.J. at 74-75. Applying those standards, the court concluded that:
... it is much too fanciful to say, from the point of view of fairness, that a reasonable manufacturer, seller or installer of water softeners would be held to recognize that he would create an unreasonable risk of any substantial physical injury whatever to anyone by the defect here involved, let alone a heart attack. [Id. at 76].
Underpinning this conclusion was the court's determination that liability should not flow from highly extraordinary consequences, but only from consequences which could be forseen to cause injury in a person normally constituted so as to bring plaintiff within the `zone of risk'. Id. citing 2 Harper & James, The Law of Torts, § 18.4, at 1035 (1956).
The outer limits of the "zone of risk" were addressed in Burd v. Vercruyssen, 142 N.J. Super. 344 (App.Div. 1976), certif. den. 72 N.J. 459 (1976) the first reported bystander case in New Jersey. There the mother of a boy killed as a result of defendant's negligence sued for the emotional anguish she suffered when she came upon the scene of the accident and identified her son's body in what the court termed a "macabre" incident. Recovery was denied on the ground that the outer limits of the "no impact rule" were established in Falzone and Caputzal and that the injury alleged by Burd fell outside those *336 limits because Burd was not in fear for her own personal safety. Id. at 356.
Thereafter, the court decided Berman v. Allen, 80 N.J. 421 (1979) in which the parents of a child born with Down's Syndrome sued the doctor and hospital for wrongful life, wrongful birth and emotional distress resulting from the negligent failure to inform them of the availability of amniocentesis. The sole element of damages for which the parents were allowed recovery was for emotional distress they suffered as the direct recipients of the defendant's wrongful acts in failing to advise them of their options, resulting in the birth of the damaged child. The court in Berman took note of the increasing number of contexts in which recovery of damages for emotional distress had been allowed, and observed that "mental and emotional distress is just as `real' as physical pain, and that its valuation is no more difficult." Id. at 433. Since the plaintiffs in Berman were not physically threatened in any way, this decision effectively put to rest the hair splitting which had taken place in cases like Burd over the exact meaning of the Falzone "zone of risk."
In 1977, in Muniz v. United Hosps. Med. Center Presbyterian Hosp. 146 N.J. Super. 512 (Law Div. 1976), rev'd 153 N.J. Super. 79 (App.Div. 1977), the parents of a dead child whose body was lost by the hospital sued for damages for the emotional distress they suffered as a result of the loss of the body. The trial judge dismissed their claims essentially as beyond Falzone. Reversing, the Appellate Division stated that:
However, after an amendment and appropriate discovery, conceivably a claim for relief for emotional distress or physical disability, or both, might be based on (1) plaintiffs' property or other right with respect to the corpse of their deceased child; or (2) an implied contract with the hospital which may have been violated; or (3) conduct by the hospital that would warrant recovery for the tort of outrage; or (4) a deviation from the standard of care reasonably to be expected of a hospital in dealing with corpses and the reasonable foreseeability that such a deviation would cause emotional and substantial physical disability with respect to persons normally constituted. As to the contract and malpractice theories of liability, an amendment, together with discovery, might bring one or both plaintiffs within the `zone of risk' assumed by the hospital. *337 See Caputzal v. The Lindsay Co., supra, 48 N.J. at 76 [153 N.J. Super. at 82-83].
The trial court decision in Muniz is particularly difficult to understand since recovery for emotional distress for wrongful disposition of a corpse has long been allowed because of the "especial liklihood" of "genuine and serious mental distress" which is attendant upon mishandling of a body and which "serves as a guarantee that the claim is not spurious." Prosser & Keeton on the Law of Torts, § 54, at 362, (5th ed. 1984). E.g., Spiegel v. Evergreen Cemetery Co., 117 N.J.L. 90 (Sup.Ct. 1936).
In Portee v. Jaffee, supra, the Supreme Court was forced to come to grips with the problems inherent in a bystander case. In Portee, the plaintiff, mother of a seven year old boy, came to the scene of an accident in which the boy was trapped in a defective elevator. She watched for hours while the boy cried out and moaned and eventually died of massive injuries. As a result she suffered severe mental anguish resulting in depression and a suicide attempt. Recognizing that it would be possible to force a true bystander case such as Portee into the Falzone/Caputzal/Berman rationales only by adopting an artificial approach, the court followed the lead of the seminal California decision in Dillon v. Legg, 68 Cal.2d 728, 441 P.2d 912, 69 Cal. Rptr. 72 (Sup.Ct. 1968) (en banc). Prior to Dillon recovery was denied in most jurisdictions for bystander claims in which the emotional distress flowed from witnessing peril or injury to another. In Dillon, Justice Tobriner debunked the traditional grounds for denying bystander recovery, which were based on fears of remoteness. The court established in their place three factors which would determine whether an emotional injury of a bystander would be compensable because "foreseeable":
(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneously observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were *338 closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship. [Id. at 740, 441 P.2d at 920, 69 Cal. Rptr. at 80].
Our Supreme Court in Portee accepted the Dillon theory and formulated its own special rules for recovery in a bystander case. These rules were correctly restated by the majority in this case: (1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resultant severe emotional distress. 84 N.J. at 101. The point of these restrictions was to delimit with specificity those situations for which recovery would be allowed in the potentially limitless field of familial emotional distress resulting from the death or injury of a loved one. In addition Portee reconfirmed that the restrictive reading of Falzone in Burd v. Vercruyssen, supra, was incorrect and that Caputzal and Berman established that the "zone of risk" of emotional distress need not coincide with a risk of physical harm. Thus, while the Portee criteria must be met in a bystander case, recovery for emotional distress is allowable in New Jersey in a direct victim case without physical impact, without fear of physical injury and without meeting the standards established in Portee, so long as the duty/breach/forseeable damage requirements of Caputzal are met. Accord, e.g., Molien v. Kaiser Found. Hosps., 27 Cal.3d 916, 616 P.2d 813, 167 Cal. Rptr. 831 (Sup.Ct. 1980); Rodrigues v. Hawaii, 52 Hawaii 156, 472 P.2d 509 (Sup.Ct. 1970).
The problem with the majority opinion here is that it fails to recognize the critical distinction between a "bystander" case and one such as this in which negligence flows directly from plaintiff to defendant. See Dooley, Modern Tort Law § 15.01 et seq. (Rev. ed. 1982) for a comprehensive discussion of the development of the law governing emotional injury which specifically delineates the distinction between the bystander category and direct negligent conduct. See also Molien v. Kaiser *339 Found. Hosp., supra, which distinguished Dillon v. Legg, supra, and held that that case applies only when "plaintiff [seeks] recovery of damages ... suffered as a percipient witness to the injury of a third person," whereas Molien was a direct victim of the negligent conduct. 27 Cal.3d at 923, 616 P.2d at 816, 167 Cal. Rptr. at 839. Accord Johnson v. State, 37 N.Y.2d 378, 334 N.E.2d 590, 372 N.Y.S.2d 638 (Ct.App. 1975).
It is only the bystander cases to which the Portee rules apply. Instructive on this issue is the decision in Eyrich for Eyrich v. Dam, 193 N.J. Super. 244 (App.Div. 1984), certif. den 97 N.J. 583 (1985), where neither of the plaintiffs who suffered emotional distress were related to the victim, a small child in their care who was mauled by a circus leopard. Mr. Eyrich attempted to rescue the child from the leopard. The court held that the question of the applicability of Portee principles did not need to be addressed in order for Mr. Eyrich to recover for emotional distress, because "defendant's liability to Mr. Eyrich does not at all depend on his alleged bystander role." Id. at 255 citing 2 Restatement, Torts 2d, § 436(a). The court went on to apply a foreseeability analysis to a rescuer's intervention, id. at 256 and approved recovery to Mr. Eyrich. However, it disapproved recovery to Mrs. Eyrich because "[she] was a bystander, not a participant, and we are satisfied that the harm she sustained would be compensable only by an extension of Portee [because she was not bound to the family by intimate family ties]." Id. at 259. What is significant about Eyrich is that it emphasizes the distinct class of cases to which the Portee conditions apply  the so-called bystander cases  and that Portee is no bar to recovery for negligently caused emotional distress in a nonbystander situation. Eyrich also distinguishes the bystander case from other cases of negligence in terms of Restatement § 436 which provides:
§ 436. Physical Harm Resulting From Emotional Disturbance
(1) If the actor's conduct is negligent as violating a duty of care designed to protect another from a fright or other emotional disturbance which the actor should recognize as involving an unreasonable risk of bodily harm, the fact that *340 the harm results solely through the internal operation of the fright or other emotional disturbance does not protect the actor from liability.
(2) If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to fright, shock, or other similar and immediate emotional disturbance, the fact that such harm results solely from the internal operation of fright or other emotional disturbance does not protect the actor from liability.
(3) The rule state in Subsection (2) applies where the bodily harm to the other results from his shock or fright at harm or peril to a member of his immediate family occurring in his presence.
Eyrich adopts § 436(2) but identifies Portee as § 436(3) case. This is a § 436(1) case. See also § 313 and Calliari v. Sugar, 180 N.J. Super. 423, 426-428 (Ch.Div. 1980), a bystander decision arising out of intentional conduct which foreshadowed the rule in Portee in which Judge Haines analyzes the distinction between cases involving actions directed at the complaining parties, 180 N.J. Super. at 426 and those which involve indirect victims of misconduct, id. at 428.
The cases with few exceptions can be divided into bystander and direct-victim categories. Among the bystander cases, Portee is classic. See also Burd v. Vercruyssen, supra; Mercado v. Transport of New Jersey, 176 N.J.Super 234 (Law Div. 1980); Bischoff v. Kohlrenken, 185 N.J. Super. 548 (Law Div. 1982). In each of these cases, plaintiffs' children were the direct victims of defendants' negligence, while plaintiffs were "bystanders" who sought recovery as the "percipient witnesses" of their children's suffering and death. These are the cases to which the Portee rules apply.
The direct victim cases for which recovery does not depend on the Portee bystander rules include Berman v. Allen, supra, and Muniz v. United Hosps. Med. Cen. Presbyterian Hosp., supra. Hume v. Bayer, 178 N.J.Super 310 (Law Div. 1981) is also within this line of plaintiff-as-victim cases despite the fact that it deals with intentional rather than negligent infliction of emotional distress. In Hume a physician knowingly told the parents of a boy who had a mildly infected appendix that his condition was potentially cancerous. The court held that the actionable conduct was directed at the parents, despite the fact *341 that there was a third party, their son, involved and that they could recover for the infliction of emotional distress. Id. at 317-319.
The fundamental difference between the classes of cases is that in the bystander cases (Portee, Burd, Mercado and Bischoff) the defendant's negligence is directed toward a party other than the plaintiff whose cause of action derives out of a relationship with the actual victim. On the contrary, as the name implies, in the direct victim cases, (Berman, Muniz and Hume) the plaintiff is in fact the focus of the defendant's negligence. Here the hospital was not responsible in any way for Jeffrey's condition. His insensate body could have remained on life support indefinitely with no rights of his invaded because there was nothing left to invade. No claim was made on his behalf. Jeffrey was no more the victim here than was the dead body in Muniz. The only interests in this case which were invaded by the hospital's negligence were the interests of the Strachans as survivors of Jeffrey in the removal of his dead body from useless life support systems and its release to them for mourning and interment.
In viewing this as a bystander case, the majority was misled, I suggest, by the presence of a third party, the plaintiffs, in addition to the hospital and the dead boy. It is true that three parties are present in every bystander case; but it is equally true that the presence of three parties does not automatically classify the matter as a bystander case or invoke the bystander rules. Berman, Hume, Eyrich and Muniz attest to this. What is necessary is that the conduct at issue be analyzed as to its focus. In this case such analysis shows that the Strachans were the only victims of the hospital's negligent conduct and the only foreseeable victims of that conduct. As such, their cause of action is not to be tested against Portee and it follows that it cannot be barred by Portee.
This distinction has been widely misunderstood with courts apparently misconceiving Portee as the latest expression of the *342 Supreme Court on the subject of the negligent infliction of emotional distress when in fact Portee is at the top of the ladder of bystander cases. In Acevedo v. Essex Co., 207 N.J. Super. 579 (Law Div. 1985), for example, plaintiff sought recovery for his emotional distress when a negligently performed autopsy necessitated the exhumation of his son's body four months after burial. The judge mistakenly relied on the correctly decided bystander decision in Lindemuth v. Alperin, 197 N.J. Super. 385 (Law Div. 1984) and applied Portee. In so doing, he overlooked the fact that this was not a bystander case and that the gravamen of the complaint was the wrongful conduct directed at plaintiff rather than at his son's dead body. Under circumstances such as these in which plaintiff seeks recovery for conduct directed at him rather than at a third party, recovery should be premised solely on traditional tort law principles and not on convoluted abstractions. See e.g., Berman v. Allen, supra.
In Molien, supra, California's latest clarification of Dillon v. Legg, supra, the court rejected a rote application of the Dillon guidelines to a nonbystander case:
Here, by contrast, plaintiff was himself a direct victim of the assertedly negligent act. By insisting that the present facts fail to satisfy the first and second of the Dillon criteria, defendants urge a rote application of the guidelines to a case factually dissimilar to the bystander scenario. In so doing, they overlook our explicit statement in Dillon that an obligation hinging on foreseeability `must necessarily be adjudicated only upon a case-by-case basis.... [N]o immutable rule can establish the extent of that obligation for every circumstance in the future.' (68 Cal.2d at p. 740, 69 Cal. Rptr. at p. 50, 441 P.2d at p. 920.)
Hence the significance of Dillon for the present action lies not in its delineation of guidelines fashioned for resolution of the precise issue then before us; rather, we apply its general principle of foreseeability to the facts at hand, much as we have done in other cases presenting complex questions of tort liability. [27 Cal.3d at 923, 616 P.2d at 816, 167 Cal. Rptr. at 834-835; citations omitted].
The fact that Portee is the most recent pronouncement by the Supreme Court does not mean that it is applicable to every emotional distress situation nor does it mean that wrongful conduct which is not within its parameters is per se precluded. *343 The mere fact that negligent conduct of the type addressed here has not come before a court since Berman does not mean that liability for such wrongful conduct does not exist.
As I see it there are two separate bases on which the Strachan's claim for negligently caused emotional distress damages can be footed: directly on Caputzal and by analogy on Muniz. Turning first to Caputzal: was there a duty; was it breached; did the breach cause the Strachans to suffer severe emotional distress, and was the emotional distress foreseeable in a person normally constituted so as to bring the Strachans within the "zone of risk"?
The jury concluded that Pirolli had a duty to have procedures in effect to terminate life support and that he violated that duty resulting in injury and damage to the Strachans. These determinations were amply supported by the evidence including that of the Strachan's expert, Dr. Robbins. She testified that when life support systems are in use, the hospital and Pirolli, as its Administrator, have a duty to have "policies and procedures ... to cover every aspect of it," and that there was a deviation from that duty here as result of which the Strachans suffered "indescribable ... torture and torment." Thus, unless the finding of a duty is barred as a matter of law, the jury verdict should be sustained as having been based upon ample credible evidence.
Duty is not an abstract principle with a single meaning in every circumstance.
[It] is largely grounded in the natural responsibilities of social living and human relations, such as have the recognition of reasonable men; and fulfillment is had by a correlative standard of conduct.
........
Duty must, of necessity, adjust to the changing social relations and exigencies and man's relation to his fellows. [Wytupek v. Camden, 25 N.J. 450, 461-462 (1957)].
In short, as there are changes in society and the social order our concept of what constitutes a duty in a given circumstance may also change. Recently, in Kelly v. Gwinnell 96 N.J. 538 *344 (1984), the Supreme Court reiterated the rule which it had previously established in Goldberg v. Newark Housing Auth., 38 N.J. 578 (1962) with respect to the question of the existence of a duty:
Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk and the public interest in the proposed solution. [96 N.J. at 544.]
Purporting to apply this standard, the majority here concludes that the "hospital had no duty to provide consent forms or to have a procedure for turning off the respirator." As to the issue of consent forms, which the hospital injected into this case by extracting a consent from the Strachans before allowing Jeffrey to be removed from life support, the majority is correct. Consent forms are simply not the issue here. For what the jury found to be negligent was not the absence of a "consent form," but the absence of a "procedure" for removing life support where it was otherwise warranted. In my view that determination should be sustained.
In assessing this situation it is important to remember that this case did not arise out of an auxiliary hospital function, such as parking, a gift shop, fund raising, or out of an idiosyncratic circumstance. Rather the situation here arose out the very function for which the hospital was created  to deal with the sick and the dying, and with their loved ones and survivors who, in the ordinary course of events, can be expected to be present in the hospital at every critical stage.
Under the circumstances, it is not at all conjectural to say that a reasonable hospital administrator would realize that the time would come when a brain dead patient was ready to be removed from life support systems, and that a physician would ask the question as to what, if any, administrative process was necessary for the removal. This is especially true in light of the fact that many of our hospitals are staffed by physicians trained in other countries, as well as newly-licensed physicians, and residents on rotation who spend brief periods on staff. Indeed, it is hard to imagine that even seasoned hospital veterans *345 would not have questions about the hospital's protocol in such a serious matter, especially, where as here, the administrator himself believed that the issue had administrative implications.
The suggestion by the majority that such a "procedure" would constitute undue interference by the hospital administrator, "a business person," in a purely medical decision would be correct only if the administrator sought to dictate medical policy. It would be entirely incorrect if the administrator simply disseminated a policy either orally or in writing which clarified that removal of life support is a medical decision with no administrative overtones or requirements and that if there is a medical question involved, a prognosis committee could be invoked at the physician's request. Such a policy statement would have eliminated all of the confusion in this case, answered Dr. Venkat's inquiry, forestalled the chance of Pirolli and his lawyer paralyzing the process with the needless requirement of a court order, and prevented altogether the Strachans' hospital caused mental distress.
In terms of the classic duty analysis, it seems clear to me that there is a special relationship between the hospital and the survivors of a brain dead patient which gives rise to a duty on the part of the hospital to protect the survivors from the enhanced distress which would naturally be expected to flow if their loved one was needlessly kept "pumped up" and "frothing at the mouth" as Jeffrey was, for hours and days after his inability to return to sapient life was a proclaimed medical certainty. The execution of that duty requires rather unremarkable efforts on the part of the hospital. All that is necessary is to have procedures in effect to clarify the use and removal of life support systems so as to assure the return of the body to the survivors with dispatch. Failure to have such a procedure in effect places the survivors, who have already withstood the blow of learning that their loved one is dead, at serious risk of mental distress. That risk is entirely foreseeable in a person normally constituted. Thus, from a fairness *346 perspective there is no reason why the hospital should not be held liable for the consequences of its acts. As such, the situation falls squarely within Caputzal.
It is also entirely analogous to Muniz where the court specifically recognized that a cause of action would lie for the recovery of damages for emotional distress in a case in which there was a "deviation from the standard of care reasonably to be expected of a hospital in dealing with corpses and the reasonable foreseeability that such deviation would cause emotional and substantial physical disability with respect to persons normally constituted." Muniz, supra, 153 N.J. Super. at 82. Every element recognized in Muniz as a potential basis for recovery is present here: a duty with respect to a brain dead patient's body; a deviation from the standard, and foreseeable emotional distress. Moreover, what has always distinguished the Muniz situation from others and has been considered the lynchpin justifying recovery is equally present here: the special circumstances that serve as a guarantee that the claim is trustworthy. Prosser & Keeton, supra § 54 at 362. What is important about the Muniz analogy is that it shows that the jury determination here did not, in effect, create a new tort. Rather it identified tortious conduct which falls within a previously recognized model for which recovery has been allowed. So that, applying either Caputzal or Muniz, the jury determination as to Pirolli's negligence resulting in the infliction of mental distress to the Strachans should be sustained.
This opinion would not be complete without noting my view that the jury verdict in this case was rather high. Indeed I would not be surprised if the amount of the verdict colored the majority's view of the case. Moreover, it is hard to analyze the matter without being struck by the nagging feeling that the same wrongful conduct underpinned both damage awards. However, the defendants did not seek remittitur after trial and chose to prosecute this appeal without claiming that the jury verdict was excessive or that the Strachans received double recovery. Under the circumstances, I would not consider substituting *347 my judgment for that of the jurors at this late stage of the proceedings.
I would affirm.
NOTES
[1] State v. Watson, 191 N.J. Super. 464 (App.Div.), certif. den. 95 N.J. 230 (1983), does not require a different result. In Watson, we held that a defendant who inflicts injuries upon a person which causes brain death may be guilty of murder even though the victim is not pronounced dead until a few minutes after the life support systems are removed. Id. at 466.
[2] Assembly Bill 3737, which was passed by the Assembly, would amend N.J.S.A. 2A:84A-22.10e to confer partial civil immunity upon committee members. This bill died on the last day of the Legislative session.
[3] In a recent unreported opinion from Ohio, Estate of Edna Marie Leach v. Howard D. Shapiro, No. CV82-7-2059 (Summit County Court of Common Pleas, Sept. 18, 1985), plaintiff sued a physician and a hospital for not turning off the respirator upon request, on a comotose patient. The case was tried on the theory of a battery based on a continuation of treatment after the request to disconnect the respirator. Plaintiffs settled with the hospital and the trial judge entered a directed verdict in favor of the physician. The case was reported in the New York Times on September 18 and 19, 1985 and is available through Lexis as a "Right to Die Case."
[4] The hospital makes no contention on this appeal that its liability is limited by N.J.S.A. 2A:53A-8 to $10,000.